No. 46,829

DEBORAH J. KNOBLE, WIDOW, CAMILLE E. KNOBLE AND SONJA G. KNOBLE, MINOR DAUGHTERS OF VIRGIL LEO KNOBLE, DECEASED, *Appellees*, v. NATIONAL CARRIERS, INC. AND HARTFORD ACCIDENT AND INDEMNITY COMPANY, *Appellants*.

(510 P. 2d 1274)

Opinion filed June 9, 1973.

*Garry W. Lassman*, of Keller, Wilbert, Palmer and Lassman, of Pittsburg, argued the cause and was on the brief for the appellants.

*Murvyl M. Sullinger*, of Pittsburg, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

FOTH, C.: In 1971 Virgil L. Knoble and Dean W. Bateman were joint owners of a 1968 International tractor which they had leased to National Carriers, Inc., a nationwide trucking firm whose chief business was hauling beef for its parent company, National Beef Packing Company, of Liberal, Kansas. Their contract with National Carriers required the partners to furnish not only the tractor but their own services as drivers (or those of acceptable substitutes).

On January 8, 1971, they were hauling one of National Carriers' refrigerated trailers loaded with National Beef's meat to Worcester, Massachusetts. Near Indianapolis, Indiana, they had a collision in which Knoble was killed. His dependents applied for benefits under the workmen's compensation act, which were allowed at both the administrative and district court levels. National Carriers and its workmen's compensation insurance carrier have appealed, contending primarily that Knoble and Bateman were independent contractors, and not employees of National Carriers.

The trial court found, as had the workmen's compensation examiner, that "the relationship of employer and workman existed between the respondent and the decedent." Our scope of review is, of course, severely limited:

"Under K. S. A. 44-556, the appellate jurisdiction of this court in workmen's compensation cases is limited to reviewing questions of law only. Whether the district court's judgment in a compensation case is supported by substantial competent evidence is a question of law as distinguished from a question of fact. (*Holley v. Dickey Clay Mfg. Co.*, 157 Kan. 355, 139 P. 2d 846, 148 A. L. R., Anno., 1131; *Coble v. Williams*, 177 Kan. 743, 747, 282 P. 2d 425; *Bowler v. Elmdale Developing Co.*, 185 Kan. 785, 347 P. 2d 391.) In reviewing the record to determine whether it contains substantial evidence to support the district court's factual findings, this court is required to review all of the evidence in the light most favorable to the prevailing party below. Where the findings of fact made by the district court are based on substantial evidence, they are conclusive, and we have no power to weigh the evidence and revise those findings or reverse the final order of the court. Although this court may feel the weight of the evidence, as a whole, is against the findings of fact so made, it may not disturb those findings if they are supported by substantial competent evidence. (*Evans v. Board of Education of Hays*, 178 Kan. 275, 284 P. 2d 1068; *Barr v. Builders, Inc.*, 179 Kan. 617, 296 P. 2d 1106; *Weimer v. Sauder Tank Co.*, 184 Kan. 422, 337 P. 2d 672; *Durnil v. Grant*, 187 Kan. 327, 356 P. 2d 872.) Numerous decisions of like import

are cited in 9 West's Kansas Digest, Workmen's Compensation, §§ 1940, 1969, and 5 Hatcher's Kansas Digest (Rev. Ed.), Workmen's Compensation, § 153." (*Jones v. City of Dodge City,* 194 Kan. 777, 778-9, 402 P. 2d 108.)

In *Shay v. Hill,* 133 Kan. 157, 158, 299 Pac. 263, we put it a little differently when we asked "Was there evidence, whether opposed or not, warranting a reasonable inference, although a contrary inference might reasonably be drawn, to sustain the judgment of the district court?" We look, then, for evidence from which the trial court might reasonably have drawn its inference that Knoble and Bateman were employees rather than independent contractors; we are not concerned with evidence from which the contrary inference might be drawn.

Such evidence must, of course, meet certain yardsticks. In *Jones,* supra, we said:

"It is often difficult to determine in a given case whether a person is an employee or an independent contractor since there are elements pertaining to both relations which may occur without being determinative of the relationship. In other words, there is no exact formula which may be used in determining if one is an employee or an independent contractor. The determination of the relation in each instance depends upon the individual circumstances of the particular case.

"*The primary test* used by the courts in determining whether an employer-employee relationship exists is *whether the employer has the right of control* and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished. It is not the actual interference or exercise of control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor. (*Evans v. Board of Education of Hays,* [178 Kan. 275, 284 P. 2d 1068]; *Davis v. Julian,* 152 Kan. 749, 756, 107 P. 2d 745; *Schroeder v. American Nat'l Bank,* 154 Kan. 721, 121 P. 2d 186.)" (194 Kan., at 780. Emphasis added.)

See also, *McCarty v. Great Bend Board of Education,* 195 Kan. 310, 403 P. 2d 956.

In particular, therefore, we seek evidence to satisfy the "primary test" of the "right of control." We look first at the description of the parties' relationship given by the surviving partner, Bateman, as summarized by the examiner:

"Bateman related that although the tractor unit was leased to Respondent, he and Knoble drove it. They received their instructions from the dispatcher of National Carriers, Inc. These instructions included what commodity was to be hauled, to whom, where and when it was to be delivered.

"After leaving with a load of a particular commodity, which was usually beef, from Liberal, Kansas, they were to make what was termed 'check calls' each day between 8:00 a. m. and 10:00 a. m. and 4:00 p. m. and 6:00 p. m. to

Respondent's dispatcher. The purpose of these 'check calls' was to inform the dispatcher of their location, distance from destination, approximate arrival time and receive further instructions, if any.

"Upon arrival at a destination, they were required to call Respondent's dispatcher and inform him that they were ready to unload. They would usually then be instructed to call the dispatcher when they unloaded. After unloading the beef, company policy (National Carriers, Inc.) required that the trailer be washed and cleaned for the next load. After unloading and cleaning the trailer, they would then receive instructions from Respondent's dispatcher in regard to their next load; what commodity it was to be, when and where it was to be delivered.

"The return load was usually as close to the midwest as possible and could be any commodity. Bateman and Knoble had no control over the commodity, its destination or arrival time and they had no authority to contract with shippers on their own.

"Upon returned [sic] to the Midwest, Bateman and Knoble would usually call in to Respondent's dispatcher for further instructions. They were then told what they were to do next.

"The tractor unit owned by Bateman and Knoble and leased to National Carriers, Inc., was subject to regular safety inspection by Respondent; was driven on license tags and I. C. C. and K. C. C. permits issued to Respondent; Respondent paid the fuel tax for the tractor and the unit fuel. Respondent carried public liability, property damage and cargo insurance as well as collision insurance on the trailer. Bateman and Knoble insured the tractor unit for collision insurance.

"Bateman and Knoble were pretty well regulated in the time they could spend at home and away from their truck because of the obligation to deliver loads on time.

"If they were at home, they had to make their regular check calls twice daily and were subject to a $25.00 fine if they failed to do so.

"Bateman and Knoble were paid 70 percent of the gross revenue taken in by the truck; no social security or withholding tax was withheld or paid in or for their behalf.

"Bateman and Knoble were responsible for the expense of maintenance and repair of the tractor.

"Bateman signed the contract or lease agreement in his own behalf and that of the decedent Virgil Knoble, the original of which is a part of the record as Respondent's Exhibit No. 1.

"According to the terms of the contract, Bateman and Knoble were to furnish the tractor and labor to haul up to 4,000,000 pounds of commodities, although there was no promise on the part of Respondent to furnish any commodities to haul. Respondent was to have the exclusive possession, control and use of the leased tractor. The contract could be terminated immediately for violation of its terms and without cause on thirty days written notice.

"The contract further provided that the parties did not intend to create an employer-employee relationship between Respondent and Bateman and Knoble or any of their employees, if any.

"The contract provided that it was to become effective upon its execution and remain so for not less than 30 days and 'that upon completion of the

obligation of transportation as provided in paragraph 1, by the contractor, this contract and all its terms and conditions shall be automatically renewed to the extent of the obligation of transportation provided in paragraph 1. This contract shall likewise be automatically renewed upon each subsequent completion of transportation, as provided in paragraph 1, unless terminated in the manner hereinbefore provided'.

"Bateman and Knoble had no prescribed days or time they had to work, but they were required to haul their loads and adhere to I. C. C. regulations regarding working time.

"Bateman and Knoble were furnished with identification cards showing them to be employees of Respondent for purposes of identification on the road and for gaining admission to the premises of National Carriers, Inc. and National Beef Packers, Inc.

"They were given advances for expense money which were deducted from their payments upon completion of a load."

This testimony was supplemented by that of the general manager of National Carriers at the time of the accident, similarly summarized:

"Some trailers used for the hauling of quartered beef carcasses were owned by Respondent and some were leased from individual contractors or operators.

"National Beef Packing Company and National Carriers, Inc. used the same yards or facilities located in Liberal, Kansas. Trailers were loaded with beef by employees of National Beef Packing Company. Drivers normally do not go in the loading area and supervise loading, but they can make suggestions as to how the load could be apportioned so that the trailer would not be overloaded on one end or the other.

"Drivers were instructed as to what temperature was to be maintained in the trailer, and instructed not to drive fast over rough roads or railroad tracks. Drivers were required to call in twice daily while they were on a trip. A fine of $25.00 would be levied if they failed to do so.

"If drivers had permission to be at home, they were not considered to be on duty and were not required to make check calls, except possibly on Thursday for possible loading on Friday.

"Respondent furnished motel facilities for drivers who were waiting in Liberal, Kansas, for their trailer to be loaded.

"Upon unloading beef at is destination, which was performed by consignee's, drivers were to call in for information on their next load. They could not accept a return load without Respondent's knowledge and permission.

"In some instances, Respondent would 'trip lease' the tractor-trailer unit to other companies for a return trip. In this case, the drivers would, to a degree, be under the control of the company to which they were leased, but the drivers would still 'check call' Respondent's dispatcher and still follow Respondent's instructions.

"All revenue from hauling and trip leases went to and was handled by Respondent. Respondent paid all fuel tax with the exception of the state of Ohio.

"Any one expecting to operate one of Respondent's trucks was required to fill out a job application form; and although the Department of Transportation

Regulations required that a driver be physically and mentally qualified and experienced, Respondent did control whether a particular person could drive one of the leased units.

"Mr. Pruitt was partly responsible for the formation of the lease agreements and his purpose in trying to set up an independent contractor relationship was to relieve Respondent of the obligation of deducting and paying social security and withholding taxes.

"Drivers could not be allowed to pick up loads of freight on their own but must haul loads contracted for by Respondent 'because no company—National Carriers included—could just let operators go helter skelter and not know where they were at, what they were doing, and where they were going. They couldn't have any control over that type of operation'."

All the foregoing testimony was substantially uncontradicted.

Respondent's efforts before the examiner were largely devoted to explaining the control which it clearly exercised by pointing to the requirements of the governmental regulatory agencies under which it operated. While such regulations may indeed furnish reasons for at least part of the control exercised, they do not alter the fact of its existence.

One witness, the company controller, pointed out that National Carriers owned all the trailers and some of the tractors it used, and to drive the latter employed drivers on its regular payroll. For its payroll drivers it carried a group Blue Cross-Blue Shield policy; its "contract" drivers were not eligible for that policy, so for them the company carried a group policy with Bankers Life affording hospitalization, major medical, life and disability insurance. The payroll drivers had, he said, "certain rules and regulations they had to follow." Asked what different status the "contract" drivers had as to complying with the company's rules and regulations, he replied:

"A. Two big differences I think of right off, drivers on our company owned tractors were required to leave the tractors on National Beef's lot every night when they left. The tractor never went home with them. They were also required to be there. Another one was we told our drivers where to fuel up, where to fill the tractor up with gas, with fuel. We have certain areas designated, designated areas, where they go in, fill up, sign a ticket and leave. They do not pay for it.

"Q. These persons operating under this contract don't have to do that, is that right?

"A. No."

Other evidence showed that while the partners might be able to take their truck home they were not permitted to use it, even for moving Knoble's own mobile home.

Without recapitulating, we think the evidence amply supports

the examiner's conclusion, adopted by the trial court, "that Respondent exercised or had the right to exercise as much control over the drivers of leased vehicles as it desired or was required to exercise in order to operate efficiently." On this record the inference of an employer-employee relationship is clearly permissible. See *Watson v. Dickey Clay Mfg. Co.,* 202 Kan. 366, 450 P. 2d 10; *Wilbeck v. Grain Belt Transportation Co.,* 181 Kan. 512, 313 P. 2d 725; and *Shay v. Hill,* supra. In each of these cases an owner-driver of a truck, operating under arrangements closely analagous to the one at bar, was held to be an employee and not an independent contractor.

The company, however, urges that this conclusion squarely contradicts the express language employed by the parties in their written contract, and thus deprives it of its constitutionally guaranteed freedom of contract. The simple answer to this contention is that, as demonstrated by the authorities previously cited, the relationship of contracting parties depends on *all* the operative facts; the label which they choose to employ is only one of those facts. Parties are free to contract as they please, but mere terminology cannot bind a court or prevent it from assessing the effect of the overall conduct of the parties.

Finally, the company objects to the order of the director fixing Crawford County as the place for hearing by the examiner. Both parties recognize that the act contains no venue provision applicable to an out-of-state accident covered by the Kansas act. To fill the gap the director had duly adopted K. A. R. 51-3-6:

"The law does not provide for the venue of hearing a claim when the accident occurred out of the state. It is the ruling of the director that when an accident has occurred outside of the state of Kansas, and the Kansas workmen's compensation director has jurisdiction to determine the claim, the workmen's compensation director for the state of Kansas shall have jurisdiction to designate the county in Kansas where the claim shall be heard, and the setting of the claim for hearing in a certain county in Kansas shall constitute the order designating venue. The district court of the county in which such claim arising from an injury which has occurred outside the state of Kansas is finally set for determination shall have jurisdiction of an appeal taken from an award of the director. The director will entertain an application of the employee or employer as to where a claim arising out of an injury which occurred outside of the state of Kansas shall be set for hearing, to accommodate the parties."

The company requested the director to fix venue in Neosho County, where claimants lived, while the claimants objected to

moving it from Crawford County where counsel for both sides were officed, where most of their witnesses lived, and where they intended to move. On appeal, the company also suggests that Seward County would have been a proper venue, since that was the situs of the contract.

The company's position depends on borrowing venue provisions from the Code of Civil Procedure, a course which we have consistently rejected. See, *Kissick v. Salina Manufacturing Co., Inc.,* 204 Kan. 849, 466 P. 2d 344, Syl. ¶ 3; *Magers v. Martin Marietta Corporation,* 193 Kan. 137, 392 P. 2d 148, Syl. ¶ 1; *Fleming v. National Cash Register Co.,* 188 Kan. 571, 363 P. 2d 432, Syl. ¶ 4. The director is authorized by K. S. A. 44-573 to promulgate such rules and regulations as may be necessary to administer the act, and K. A. R. 51-3-6 fell within that authority. (The subsequent amendment of the regulation is not material here.) The director was required by regulation to exercise his discretion; we find no abuse in its exercise here, and certainly no prejudice to the respondent.

The judgment is affirmed.

APPROVED BY THE COURT.