No. 65,189

BERLIN FALLS, *Appellant,* v. ROSEMARY SCOTT and
HARRY E. OHMIE, *Appellees.*

(815 P.2d 1104)

Opinion filed July 12, 1991.

*Gerald W. Scott,* of Gerald W. Scott, P.A., of Wichita, argued the cause and was on the brief for appellant.

*Michael C. Helbert,* of Helbert, Bell & Smith, Chartered, of Emporia, argued the cause, and *James R. Campbell,* of the same firm, was with him on the brief for appellee Rosemary Scott.

*John G. Atherton,* of Atherton & Vander Velde, of Emporia, argued the cause and was on the brief for appellee Harry E. Ohmie.

The opinion of the court was delivered by

LOCKETT, J.: This is a personal injury negligence action. Berlin Falls, while on his property, was severely injured when a "brush hog" mowing machine being operated on adjacent property threw a piece of wire that struck him in the face and eyes. Falls sued Rosemary Scott, the landowner, and Harry Ohmie, the mowing

machine operator, for Falls' injuries resulting from their alleged negligence. Although the jury returned a verdict for Falls, he appeals a number of adverse trial court rulings, claiming the trial court erred in: (1) not allowing plaintiff's expert witness to testify concerning the nature of a brush hog and its inherent dangerous design; (2) ruling that the brush hog was not inherently or abnormally dangerous and its operation within the city limits was not inherently dangerous; (3) determining that defendant Scott was not responsible under Restatement (Second) of Torts § 427 (1963) for an independent contractor's negligent operation of the brush hog because the independent contractor was not performing an inherently dangerous activity; (4) finding the landowner had committed no independent acts of negligence; (5) ruling there was no evidence of an employment or agency relationship between Scott and yard man Sonny Vaugh and the men working on Scott's property; and (6) prohibiting a plaintiff's witness from testifying as to his employment status, but allowing defendants' witnesses to testify as to their employment status.

The basic facts are not in dispute. Plaintiff, Berlin Falls, and his wife live in the town of LeRoy, Kansas. To the south of the Falls' home was the home of a neighbor. To the east of the neighbor's property was vacant land known as the Trimble property, which consisted of four vacant lots. The Trimble property was purchased by defendant Rosemary Scott in late June 1987.

After Scott purchased the property, she hired Sonny Vaugh (William G. Vaugh, Jr.) and his crew to clean up the property. When Sonny and his crew could not clear the lots of the trash, bottles, fence posts, and fencing wire or mow because of the tall weeds and other growth, Scott contacted Harry E. Ohmie to clear the vacant lots with his brush hog.

A "brush hog" is a mowing machine sometimes also referred to as a "bush hog," "field cutter," "field mower," and a "rotary mower." It is a large mowing machine designed to cut brush, small trees, or high weeds and grass and is pulled and powered by a tractor.

On July 6, 1987, Ohmie began mowing the vacant property for Scott. While Falls was walking in his back yard, he was struck in the face and eyes by a piece of wire thrown over 80 feet from the vacant land by Ohmie's "brush hog" mowing machine.

Plaintiff filed this personal injury lawsuit for damages arising from alleged negligence of Scott and Ohmie. Prior to trial Scott filed two motions for partial summary judgment on the issue of independent contractor and a motion in limine as to plaintiff's expert's testimony. The trial court granted or partially granted all three motions. At the conclusion of evidence, Scott moved for a directed verdict, claiming there was no evidence that she was negligent or that Sonny Vaugh and his crew were her employees or agents. The trial judge granted Scott's motion for directed verdict. Although the plaintiff had not joined Sonny Vaugh as a defendant in the action, the jury was allowed to compare his negligence. The jury attributed 30% fault to Falls, 30% to Ohmie, and 40% to Sonny Vaugh and his employees. Falls' damages were determined to be $106,117.13. Falls appealed, raising various issues.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. *Patterson v. Brouhard*, 246 Kan. 700, 702, 792 P.2d 983 (1990).

In his petition Falls alleged that Scott was liable for Ohmie's negligence because of their relationship as master-servant. Scott's first motion for partial summary judgment claimed that Ohmie, the brush hog operator, was an independent contractor and under the law she was not liable for the negligence of an independent contractor. The trial court correctly determined that Ohmie was an independent contractor at the time of the accident.

Falls' petition also asserted that even if Ohmie was an independent contractor Scott was liable for Ohmie's negligence under Restatement (Second) of Torts § 427 because a brush hog is an inherently dangerous instrumentality, and the operation of the brush hog in the city was an inherently dangerous activity such that, under Restatement (Second) of Torts §§ 519 and 520 (1976), Scott was strictly liable for the harm which resulted from an abnormally dangerous activity. The trial court granted Scott's sec-

ond motion for partial summary judgment, finding (1) the operation of a brush hog in LeRoy, Kansas, is not an abnormally dangerous activity; and (2) whether a brush hog is an inherently dangerous instrumentality is a matter of law to be determined by the court. The court then determined that the brush hog was not inherently dangerous.

Though the trial court used the terms "dangerous instrumentality" and "inherently dangerous activity" interchangeably, there is a difference.

"To be inherently dangerous, a commodity or condition must be so imminently dangerous in kind as to imperil the life or limb of any person who uses it, or, burdened with a latent danger or dangers that derive from the very nature of the commodity or condition itself and not from any defect in the thing. 'Inherently dangerous' has also been said to mean a type of danger inhering in an instrumentality or condition itself at all times, requiring special precautions to be taken to prevent injury, and not a danger arising from mere casual or collateral negligence of others under particular circumstances. Instrumentalities or substances which, by their very nature are calculated to do injury are considered to be dangerous per se. An instrumentality is dangerous per se if it may inflict injury without the immediate application of human aid." 57A Am. Jur. 2d, Negligence § 324.

Generally, instrumentalities or substances which by their very nature are calculated to do injury are considered to be dangerous per se. Among the things which have been characterized as being dangerous instrumentalities are: poisons; explosives and explosive devices; firearms, particularly if they are loaded; explosive substances; grinding wheels which contain a latent defect causing them to explode or disintegrate upon ordinary use; dry ice; bottles of beverages under pressure or containing any ingredient which would cause them to explode upon ordinary handling; and, in some cases, airplanes. There is some authority to the effect that electricity is a dangerous instrumentality, but the mere fact that an instrumentality is run by electric power has been held not to make it inherently dangerous. Certain machines may come within the category of dangerous machines, the use of which is limited by statute. 57A Am. Jur. 2d, Negligence §§ 322, 324, 325.

Although objects such as bicycles, lawnmowers, power tools, motorcycles, or automobiles could be considered "dangerous instruments" in some contingencies, ordinary objects put to ordi-

nary uses are not generally considered to be dangerous instrumentalities. 57A Am. Jur. 2d, Negligence § 323.

We agree with the trial judge's conclusion that a brush hog properly used is not itself a dangerous instrument. There still remains the question of where the improper use of the brush hog or use of a brush hog without proper safety devices installed on the machine is an inherently dangerous activity.

As a general rule, when a person (a contractee) lets out work to another and reserves no control over the work or workmen, the relation of contractee and independent contractor exists, and not that of master and servant, and the contractee is not liable for the negligence or improper execution of the work by the independent contractor. *Balagna v. Shawnee County*, 233 Kan. 1068, Syl. ¶ 3, 668 P.2d 157 (1983). An exception to the general rule is the inherently dangerous activity doctrine, which provides that one who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such dangers. *Balagna*, 233 Kan. 1068, Syl. ¶ 4.

Restatement (Second) of Torts § 427 defines the "inherently dangerous activity" doctrine in the following language:

"One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger."

The Restatement (Second) of Torts § 519 sets forth the general rule regarding strict liability in tort for abnormally dangerous activities as follows:

"(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

"(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous."

Section 520 of the Restatement (Second) of Torts sets out the following test for determining whether an activity is abnormally dangerous:

"In determining whether an activity is abnormally dangerous, the following factors are to be considered:

"(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

"(b) likelihood that the harm that results from it will be great;

"(c) inability to eliminate the risk by the exercise of reasonable care;

"(d) extent to which the activity is not a matter of common usage;

"(e) inappropriateness of the activity to the place where it is carried on; and

"(f) extent to which its value to the community is outweighed by its dangerous attributes."

We adopted §§ 519 and 520 of the Restatement (Second) of Torts in *Williams v. Amoco Production Co.*, 241 Kan. 102, 115, 734 P.2d 1113 (1987).

Under the facts, Ohmie's operation of the brush hog could have been an inherently dangerous activity which involved a special danger to others such that Scott, the employer of the independent contractor, was subject to liability for physical harm caused by the contractor's failure to take reasonable precautions against such danger. Falls asserts the question of "inherently dangerous instrumentality" and "inherently dangerous activity" must be determined by the jury as a question of fact upon which reasonable minds could differ. Scott argues that the determination of whether an activity is "inherently dangerous" is not a question of fact for a jury to determine, but a matter of law for the court to decide. Scott relies on *Balagna* and cases from other jurisdictions. *Balagna*, 233 Kan. at 1082. See *Horn v. C. L. Osborn Contracting Co.*, 591 F.2d 318 (5th Cir. 1979); *Hare v. Federal Compress and Warehouse Company*, 359 F. Supp. 214 (N.D. Miss. 1973); *Oklahoma City v. Caple*, 187 Okla. 600, 105 P.2d 209 (1940); *Kemp v. Knox County*, 556 S.W. 2d 546 (Tenn. App. 1977). The commentary to the Restatement (Second) of Torts § 520 takes the position that whether the activity is an abnormally dangerous one is to be determined by the court, upon consideration of all the factors listed in the section defining an abnor-

mally dangerous activity. For additional authority, see 57A Am. Jur. 2d, Negligence § 418.

As to the question of what type of work is or is not considered to be inherently or intrinsically dangerous, courts have found no rule of universal application by which they may abstractly draw a line of classification in every case. Generally speaking, the proper test to determine if an activity is inherently dangerous is whether danger inheres in the performance of the work, and important factors to be understood and considered are the contemplated conditions under which the work is to be done and the known circumstances attending it. It is not enough that it may possibly produce injury. Stated another way, intrinsic danger in an undertaking is one which inheres in the performance of the contract and results directly from the work to be done—not from the collateral negligence of the contractor. *Reilly v. Highman*, 185 Kan. 537, 541, 345 P.2d 652 (1959); 41 Am. Jur. 2d, Independent Contractors § 41, p. 807; 57 C.J.S., Master and Servant § 590, b.(1); Annot. 23 A.L.R. 1084, 1095. The same test is recognized in *Phillips Pipe Line Co. v. Kansas Cold Storage, Inc.*, 192 Kan. 480, 488, 389 P.2d 766 (1964).

In *Balagna*, we were faced with the issue of whether trenching work fell within the ambit of the inherently dangerous activity doctrine creating liability on the landowner-contractee for the negligence of the independent contractor. The plaintiffs argued that trenching operations are inherently dangerous. We noted some jurisdictions have found as a matter of law that trenching operations are inherently dangerous while other jurisdictions have ruled as a matter of law that trenching is not inherently dangerous. We noted that the trial court had found that as a matter of law, on the basis of the undisputed facts contained in the record, the trenching operations involved in that case were not inherently or intrinsically dangerous, and concluded that the trial court had reached the correct result. *Balagna*, 233 Kan. at 1082.

When the facts are undisputed, whether an activity is inherently or intrinsically dangerous is a question of law to be decided by the court. When ruling on a motion for summary judgment involving this question, the trial court as a matter of law must determine from the undisputed facts contained in the record whether the activity under review is inherently dangerous. When

the facts are disputed, the question is to be determined by the jury.

Prior to commencing mowing, Ohmie warned Scott she was standing too close to the brush hog, because it would throw material out from under it. After observing objects being thrown out by the blade of the brush hog, Scott thought, " 'Well, this is enough of this,' and so I went home to my house." The undisputed facts show that Scott was aware that there was a high degree of risk of some harm to the person, land, or chattels of others. She understood the likelihood that the harm that results would be great. There is evidence that the operation of that particular brush hog or any brush hog was inappropriate to clear the lots in the city. Ohmie was aware of the danger when he stated that he had no idea of how many windows he had to replace when operating the brush hog near houses. Ohmie's brush hog had no safety shield or chain guards to prevent the mowing blade from throwing objects great distances.

In spite of these facts, the trial court ruled as a matter of law that the operation of the brush hog was not inherently or intrinsically dangerous. We find under the facts of this case that the trial court erred in finding that as a matter of law the use of the brush hog was not an inherently dangerous activity. Whether the use of the brush hog, under the facts of this case, was an inherently dangerous activity should have been submitted to the jury.

In response to Scott's motion in limine to prevent plaintiff's expert witness from testifying as to whether the operation of a brush hog is an inherently dangerous activity, the trial court ruled the plaintiff's expert witness could not testify to: (1) whether the activity in question was negligence or not negligence or (2) whether the operation of the brush hog was inherently dangerous or that the brush hog was a dangerous instrumentality. The trial court stated the plaintiff's expert could testify as to the construction, operation, and other matters pertaining to the brush hog, without using any legal words of art in his characterizations or descriptions. The plaintiff's expert did not testify at trial.

Falls argues the workings of a brush hog are not within the common knowledge of jurors so expert testimony was necessary to help the jury in arriving at reasonable factual conclusions from

the evidence. He asserts there are technical facts which require expert testimony to explain the responsibility of using a brush hog within city limits.

Testimony in the form of opinions or inferences otherwise admissible is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of fact. K.S.A. 60-456(d). Expert opinion testimony is admissible if it will be of special help to the jury on technical subjects as to which the jury is not familiar or if such testimony would assist the jury in arriving at a reasonable factual conclusion from the evidence. *Pape v. Kansas Power & Light Co.*, 231 Kan. 441, 445, 647 P.2d 320 (1982). See *Plains Transp. of Kan., Inc v. King*, 224 Kan. 17, 578 P.2d 1095 (1978).

It is a well-established rule in Kansas that the admissibility of expert testimony is within the broad discretion of the trial court. *Elrod v. Walls, Inc.*, 205 Kan. 808, 473 P.2d 12 (1970). A party claiming an abuse of trial court discretion bears the burden of showing abuse of discretion. *Slaymaker v. Westgate State Bank*, 241 Kan. 525, 531, 739 P.2d 444 (1987). The test on appellate review of whether the trial court abused its discretion is whether no reasonable person would agree with the trial court. If any reasonable person would agree, appellate courts will not disturb the trial court's decision. *Hoffman v. Haug*, 242 Kan. 867, 873, 752 P.2d 124 (1988).

The basis for the admission of expert testimony is necessity, arising out of the particular circumstances of the case. Where the normal experience and qualifications of jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are not necessary. There is nothing complicated or complex about the mechanical operation of a brush hog nor is a brush hog such a complicated machine that expert testimony is required to assist the jury in arriving at a reasonable factual conclusion from the evidence. The trial court did not abuse its discretion by excluding the expert testimony.

At the conclusion of the evidence, the trial court granted Scott's motion for directed verdict, ruling that Sonny Vaugh was an independent contractor working in conjunction with a work crew.

In ruling on a motion for a directed verdict, the court is required to resolve all facts and inferences reasonably to be drawn

from the evidence in favor of the party against whom the ruling is sought, and where reasonable minds could reach different conclusions based on the evidence the motion must be denied and the matter submitted to the jury. *Holley v. Allen Drilling Co.*, 241 Kan. 707, 710, 740 P.2d 1077 (1987).

The standard of appellate review of a motion for directed verdict is the same as that for the trial court. *Anderson v. National Carriers, Inc.*, 10 Kan. App. 2d 203, 209, 695 P.2d 1293, *rev. denied* 237 Kan. 886 (1985).

An independent contractor is defined as one who, in exercising an independent employment, contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the results or product of his work. The primary test used by the courts in determining whether the employer-employee relationship exists is whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished. It is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor. *Wallis v. Secretary of Kans. Dept. of Human Resources*, 236 Kan. 97, Syl. ¶¶ 3, 5, 689 P.2d 787 (1984).

Where the facts are undisputed or the evidence is susceptible of only a single conclusion, it is a question of law for the court whether one is an employee or an independent contractor. However, generally speaking, the question of whether an individual is an employee or an independent contractor is considered a question of fact for the jury or trier of facts. *Baker v. Petroleum Co.*, 111 Kan. 555, 561, 207 Pac. 789 (1922); 41 Am. Jur. 2d, Independent Contractors § 53.

Scott testified that she employed Sonny Vaugh to do the work and he hired various employees to do the work. She paid the men by the hour. During the period Scott was doing extensive landscaping, Sonny was working exclusively for her. To ensure that the landscaping was done as she wanted, she drew a picture for Sonny; she ordered the trees and the materials and he put

them in where she wanted. She told him what to remove from the lots and to dig holes in a certain way.

In ruling on a motion for a directed verdict, the court failed to resolve all facts and inferences reasonably to be drawn from the evidence in favor of Falls, the party against whom the ruling was sought. Reasonable minds could reach different conclusions based on the evidence. Therefore, the motion should have been denied and the question of whether Vaugh was an employee or an independent contractor should have been submitted to the jury. The trial court erred in entering a directed verdict on this issue.

Falls asserts Scott's hiring of Sonny Vaugh was an independent act of negligence on Scott's part. He bases this conclusion on testimony indicating Sonny Vaugh had an alcohol problem. Falls does not cite any evidence that Scott was in any way aware of Sonny Vaugh's problem with alcohol or offer testimony or other evidence of any facts that showed how the personal problems of Sonny Vaugh in any way affected plaintiff.

Plaintiff states the jury also could have found negligence on Scott's part for insisting on proceeding with a brush hog to clear the lots rather than hiring a bulldozer to clear the lots or waiting until fall to rake the lots or burn the weeds. Plaintiff does not cite any evidence that was introduced to support this conclusion.

We have reviewed the record and determine the court did not err in granting a directed verdict in favor of Scott on the issue of her liability for any independent acts of negligence.

Falls' final contention is that the trial court erred in not allowing William Vaugh, Sr., to testify as to his employment status, while allowing others to do so.

Plaintiff cites no case law or other authority to support his argument. He merely refers us to three portions of the trial transcript and concludes it was error for the trial court to allow defense counsel to question members of the work crew as to whom they were employed by but to refuse to allow plaintiff's counsel to ask the same questions of William Vaugh, Sr.

During the trial, plaintiff's attorney asked William Vaugh, Sr.:

"Q. Did you consider that you were actually an employee of Mrs. Scott?"

Defense counsel objected and brief arguments were made at the bench. The court refused to allow the witness to answer, stating: "Under the circumstances of this case, I do not believe that this person is qualified to make an opinion as to the difference of an employee and independent contractor. I'm therefore going to sustain the objection to the question."

Later in the trial, Robert Barnes testified on behalf of defendant Ohmie as follows:

"Q. Now referring to the summer, the early part of July, 1987, do you recall by whom you were employed?

"A. Yes.

"Q. And by whom were you employed?

"A. Sonny Vaugh.

"Q. And were you employed—"

Plaintiff's counsel objected to the question on grounds it was the exact question the court had refused to let William Vaugh, Sr., answer. The court overruled the objection.

James Haney, another member of the work crew, was later asked:

"Q. Now, going back to early July of 1987, uh, by whom were you employed?

"A. Sonny. I can't remember his last name.

"Q. Sonny Vaugh?

"A. Vaugh."

Plaintiff's counsel interposed the same objection as previously, and the objection was overruled by the court.

The question asked of William Vaugh, Sr., and the questions asked of Barnes and Haney were similar. The trial court erred in sustaining defendant's objection to the question asked of William Vaugh, Sr.

Reversed and remanded for a new trial.