In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3115

CARLENE M. CRAIG, *et al.*,

*Plaintiffs-Appellants*,

*v.*

FEDEX GROUND PACKAGE SYSTEM, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:05-md-00527-RLM-CAN—**Robert L. Miller, Jr.**, *Judge.*

ARGUED JANUARY 12, 2012—DECIDED JULY 12, 2012

Before EASTERBROOK, *Chief Judge,* and ROVNER and TINDER, *Circuit Judges.*

PER CURIAM. FedEx Ground ("FedEx") provides small package pick-up and delivery services through a network of pick-up and delivery drivers. The plaintiffs are current and former drivers for FedEx who allege that they were employees rather than independent contractors under the laws of the states in which they worked and under federal law. The Judicial Panel on

Multidistrict Litigation consolidated these actions and transferred them to the District Court for the Northern District of Indiana. That court used the *Carlene M. Craig, et al.* case, which was based on the Employee Retirement Income Security Act ("ERISA") and Kansas law, as its "lead" case. The court certified a nationwide class seeking relief under ERISA and certified statewide classes under Federal Rule of Civil Procedure Rule 23(b)(3).[1] The Kansas class has 479 members. They allege that they were improperly classified as independent contractors rather than employees under the Kansas Wage Payment Act ("KWPA" or "Act"), Kan. Stat. Ann. §§ 44-313 *et seq.*, and that as employees, they are entitled to repayment of all costs and expenses they paid during their time as FedEx employees. They also seek payment of overtime wages.

Cross summary judgment motions presented the question of whether the FedEx drivers are employees or independent contractors under the KWPA. The evidence presented through the competing motions essentially

---

[1] The Kansas class is defined as "All persons who: 1) entered or will enter into a FXG Ground or FXG Home Delivery form Operating Agreement . . .; 2) drove or will drive a vehicle on a full-time basis (meaning exclusive of time off for commonly excused employment absences) from February 11, 1998, through October 15, 2007, to provide package pick-up and delivery services pursuant to the Operating Agreement; and 3) were dispatched out of a terminal in the state of Kansas." See *In re Fedex Ground Package Sys., Inc., Emp't Practices Litig.*, No. 3:05-md-527 RM (MDL-1700), 2007 WL 3027405, at *14 (N.D. Ind. Oct. 15, 2007), & Dist. Ct. Op. & Ord. entered Apr. 4, 2008.

comprised a stipulated record revolving around a form Operating Agreement FedEx entered with each of the class members and certain FedEx work practices. FedEx asserted that the undisputed facts before the district court must result in a determination that the drivers are not employees under the KWPA. The drivers contended that the same record required the court to find that they are employees under that Act or, in the alternative, that the undisputed evidence, along with reasonable inferences that could be drawn from it, entitled them to a trial on that question. In a thorough opinion and order, the district court granted FedEx summary judgment and denied the plaintiffs summary judgment, effectively deciding that they could not prevail on their claims. *In re FedEx Ground Package Sys., Inc.*, 734 F. Supp. 2d 557 (N.D. Ind. 2010). The court then drew on its decision in *Craig* and ruled in FedEx's favor on summary judgment on the question of the plaintiffs' employment status in the other cases. *In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*, 758 F. Supp. 2d 638 (N.D. Ind. 2010). Judgments and amended judgments were entered.

Twenty-one cases are on appeal. They present substantially the same issue: whether the district court erred by deciding as a matter of law that the certified classes of plaintiffs were independent contractors and thus could not prevail on their claims. Each case, however, arises under a different state's substantive law. The parties proposed that we begin with the *Craig* appeal and stay the remaining appeals, proceeding as the district court did. We suspended briefing in the other appeals pending further order and now address the *Craig* appeal. Rather

than repeat the district court's detailed explication of the relevant undisputed facts set forth in "Section I. Common Facts Applicable to Right to Control," of its opinion, *see In re FedEx Ground*, 734 F. Supp. 2d at 560-75, we expressly adopt and incorporate it here.

## I.

When sitting in diversity, "our task is to ascertain the substantive content of state law as it either has been determined by the highest court of the state or as it would be by that court if the present case were before it now." *Thomas v. H & R Block E. Enters.*, 630 F.3d 659, 663 (7th Cir. 2011) (quoting *Woidtke v. St. Clair Cnty., Ill.*, 335 F.3d 558, 562 (7th Cir. 2003)).

The KWPA requires employers to pay their employees "all wages due." Kan. Stat. Ann. § 44-314(a). The Act provides an expansive definition of "employee": "any person allowed or permitted to work by an employer." Kan. Stat. Ann. § 44-313(b). The Act also defines "employer" broadly as well to include any corporation "employing any person." Kan. Stat. Ann. § 44-313(a). The Kansas Supreme Court has stated that the statute's definition of "employee" is "virtually identical" to the definition of "employee" in the workers' compensation statute. *Coma Corp. v. Kansas Dep't of Labor*, 154 P.3d 1080, 1092 (Kan. 2007) (comparing definition of "employee" in Kan. Stat. Ann. § 44-313 with definition of "workman," "employee," and "worker" in Kan. Stat. Ann. § 44-508(b)). The Kansas secretary of labor is authorized by statute to "enforce and administer . . . [the KWPA]," Kan. Stat. Ann.

§ 44-322(a), and to "adopt such rules and regulations as necessary for the purposes of administering and enforcing the [Act's] provisions," *id.* 44-325. There are a few such regulations: the first sets forth the meaning of several definitions used in the KWPA, Kan. Admin. Regs. § 49-20-1; the others establish the procedures for filing, processing, and determining claims, Kan. Admin. Regs. §§ 49-21-1 to -4. Importantly, the regulations provide that "[a]llowed or permitted to work" within § 44-313(b) "shall not include an independent contractor, as defined by rules, regulations, and interpretations of the United States secretary of labor for the purposes of the fair labor standards act." Kan. Admin. Regs. § 49-20-1(e).

Kansas courts look to the workers' compensation statute when construing the KWPA. *See, e.g., Campbell v. Husky Hogs, LLC*, 255 P.3d 1, 6-7 (Kan. 2011). Kansas courts have defined an independent contractor as "one who, in exercising an independent employment, contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the results or product of his work." *Falls v. Scott*, 815 P.2d 1104, 1112 (Kan. 1991). No absolute rule exists for determining whether a worker is an independent contractor or an employee. *Hartford Underwriters Ins. Co. v. State, Dep't of Human Res.*, 32 P.3d 1146, 1151 (Kan. 2001). Each case must be decided based on its own facts and circumstances. *Id.* The primary consideration is the "right of control" test: "whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well

as the result which is to be accomplished." *Falls*, 815 P.2d at 1112. The Kansas Supreme Court has said: "It is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor." *Id.*

The "right of control" test is the most important consideration in determining whether an employment relationship exists, but it is not the only one. Courts may consider other factors, including the ones enumerated in the *Restatement* (*Second*) *of Agency* § 220(2) (1958). *P.S. ex rel. Nelson v. Farm, Inc.*, 658 F. Supp. 2d 1281, 1297 (D. Kan. 2009):

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
>
> (f) the length of time for which the person is employed;
>
> (g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

*Olds-Carter v. Lakeshore Farms, Inc.*, 250 P.3d 825, 834 (Kan. Ct. App. 2011).[2]

In looking for guidance on the meaning of the KWPA, we are directed to Kansas cases addressing the employee/independent contractor status of truck drivers. The Kansas Supreme Court has found the existence of the right of control so as to support a finding of employee status in a number of such cases. *See Knoble v. Nat'l Carriers, Inc.*, 510 P.2d 1274, 1280 (Kan. 1973) (concluding

---

[2] Section 220 of *Restatement* (*Second*) *of Agency* is now part of section 7.07 of *Restatement* (*Third*) *of Agency*, which identifies essentially the same factors. Because the Kansas courts have relied on section 220, we believe they would similarly look to section 7.07. *See Kansas City Brigade, Inc. v. DTG Operations, Inc.*, No. 103,769, 251 P.3d 112 (Kan. Ct. App. Apr. 29, 2011) (unpublished). However, there may be some tension between the Kansas decisions, *see, e.g.*, *Hartford Underwriters*, 32 P.3d at 1151; *Falls*, 815 P.2d at 1112 (distinguishing between the exercise of the control and the right to control) and section 7.07 (making relevant "the extent of control that the principal has exercised in practice over the details of the agent's work"). And the plaintiff class "was certified on the basis of right to control, not actual exercise of control." *FedEx Ground*, 734 F. Supp. 2d at 560.

the company "exercised or had the right to exercise as much control over the drivers . . . as it desired"); *Anderson v. Kinsley Sand & Gravel, Inc.*, 558 P.2d 146, 152 (Kan. 1976) (concluding there was evidence of an employment relationship where truck driver engaged in "an inherent part of [the company's] business operation," and the company determined the kind and quantity of material to be loaded into the truck and where each load was to be delivered); *Watson v. W.S. Dickey Clay Mfg. Co.*, 450 P.2d 10 (Kan. 1969) (stating that when a trucker reports to the company to deliver its products, he "agrees to submit to the controls that are imposed by [the company]; otherwise he hauls none of [its] products"); *Wilbeck v. Grain Belt Transp. Co.*, 313 P.2d 725, 726-27 (Kan. 1957) (holding employment relationship existed where driver hauled freight for company whose business was exclusively the transportation of shipments of freight); *Shay v. Hill*, 299 P. 263 (Kan. 1931) (individual who furnished his own truck, equipped and operated it at his expense, and hauled animal carcasses for another at a piece rate was an employee under the Workmen's Compensation Act). On the other hand, the court has found the right of control absent in other truck-driver cases. *See Christensen v. Builders Sand Co.*, 308 P.2d 69, 70 (Kan. 1957) (drivers "could come and go as they chose," were not compelled to accept any loads, and could haul "as many or as few loads as [they] wished"); *Brownrigg v. Allvine Dairy Co.*, 19 P.2d 474, 475 (Kan. 1933) (driver had no route or district and sold milk wherever he wanted).

*Knoble*, *Anderson*, *Wilbeck*, and *Shay* were decided under the Kansas Workers' Compensation Act and

*Watson* involved an interpretation of that Act, the provi-sions of which "are to be liberally construed to bring workers under the Act . . . ." *Hollingsworth v. Fehrs Equip. Co.*, 729 P.2d 1214, 1217 (Kan. 1986). And all but *Watson* involved limited judicial review of a compensation appeal. *See, e.g.*, *Knoble*, 510 P.2d at 1277. Perhaps this explains the different outcomes in the cases discussed above. Nonetheless, the cases are difficult to recon-cile and reflect that the determination of whether an employer-employee relationship exists is based on the facts in each case. Where some of the factors weigh in favor of finding employee status, some weigh in favor of independent contractor status, and some "cut both ways," a court must weigh the factors according to some legal principle or principles. But other than the point that the right of control is the primary factor, what is the underlying principle (or principles) that guides that weighing process in close cases such as this seeking to establish an employment relationship under the KWPA? We are unsure.

Moreover, there is tension between *Knoble* and *Crawford v. State, Dep't of Human Resources*, 845 P.2d 703 (Kan. Ct. App. 1989), that further complicates our ability to predict how the Kansas Supreme Court would decide the issues before us. In *Knoble*, the court noted that the company had offered explanations for the control it exercised over the drivers by pointing to governmental regulatory requirements, but the reasons behind the control didn't matter: "While such regulations may indeed furnish reasons for at least part of the control exercised, they do not alter the fact of its existence." 510

P.2d at 1280. In the more recent *Crawford* case, however, the court of appeals seems to have taken the view that the reasons for the right to control do matter. 845 P.2d at 706-08 (concluding that evidence did not support a finding of an employment relationship where "the restrictions came not from [the business owner who provided the demonstrators] but from the manufacturers or the individual stores" and that "any control [the owner] had would have had to arise from her being able to enforce the requirements . . . of the manufacturers or stores").

Thus, the impact, if any, of the reasons behind FedEx's control over the drivers is unclear. The district court thought that the reasons FedEx retained control mattered. *See, e.g.*, *In re FedEx Ground*, 734 F. Supp. 2d at 568 (noting the testimony that "contractors must use a scanner so that customers can track their packages" and "[t]he scanners are connected to FedEx's computer system and transmit package tracking information to FedEx's website for customers to view"), 569 (noting that driver's were required to pick up and deliver at specific times when FedEx negotiated a pick-up or delivery window with a customer). The court found that "[m]any general instructions set forth by FedEx are based on customer demands" and FedEx required "that drivers meet these customer demands," *id.* at 588, which the court concluded involved "the results of the drivers' work," *id.* Of course, it is FedEx that decides what services are provided to its customers, and when. *See id.* at 591. The district court later recognized that "[d]rawing the line between means and results is a chal-

lenging, highly contextual and fact-specific task," 758 F. Supp. 2d at 658, and "what constitutes control of results in one case . . . may constitute control of means in another case," *id.* at 693, albeit in ruling in the other pending cases following its decision in *Craig.*

In addition to our considerable doubt as to how the Kansas Supreme Court would apply its law to the facts and circumstances of this case, we are aware that other courts have reached different conclusions regarding FedEx drivers' employment status. The District of Columbia Circuit held that FedEx single route drivers were independent contractors under the National Labor Relations Act, see *FedEx Home Delivery v. NLRB*, 563 F.3d 492 (D.C. Cir. 2009) (reviewing the same or substantially same Operating Agreement), but the Eighth Circuit reversed the grant of summary judgment in favor of FedEx, concluding that there was a genuine issue of material fact as to whether under Missouri law the driver of a tractor trailer bearing FedEx insignia was a FedEx employee or independent contractor, see *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853 (8th Cir. 2010). Other reported decisions only add to the uncertainty as to the FedEx drivers' status. *Compare Johnson v. FedEx Home Delivery*, No. 04-CV-4935 (JG) (VVP), 2011 WL 6153425 (E.D.N.Y. Dec. 12, 2011) (holding plaintiffs who contracted to provide delivery services to FedEx under the Operating Agreement were independent contractors under New York law), *with Estrada v. FedEx Ground Package Sys., Inc.*, 64 Cal. Rptr. 3d 327 (Cal. Ct. App. 2007) (holding single work area drivers were employees rather than independent contractors under California law).

As noted, the KWPA was intended to protect wages and wage earners. *Campbell*, 255 P.3d at 6-7. "It is an expansive and comprehensive legislative scheme that is broad in its scope and the rights created for Kansas workers to secure unpaid wages earned from their labors." *Id.* at 6. The Act "embeds within its provisions a public policy of protecting wage earners' rights to their unpaid wages and benefits." *Id.* at 7; *see also Coma*, 154 P.3d at 1092 (stating that protection of wages and wage earners had been a principal objective of numerous Kansas state laws including the KWPA). Perhaps the Kansas public policy tips the scales in favor of finding employee status for purposes of the KWPA in close cases such as this. We cannot be sure, and the Kansas Supreme Court is in a far better position to provide a definitive answer on this controlling question of state law than are we.

In deciding whether certification is appropriate, *see* Circuit Rule 52(a); Kan. Stat. Ann. § 60-3201, "the most important consideration guiding the exercise of [our] discretion . . . is whether [we] find[ ] [ourselves] genuinely uncertain about a question of state law that is vital to a correct disposition of the case." *Cedar Farm, Harrison Cnty., Inc. v. Louisville Gas & Elec. Co.*, 658 F.3d 807, 812-13 (7th Cir. 2011) (quotation and citation omitted). "[C]ertification is appropriate when the case concerns a matter of vital public concern, where the issue will likely recur in other cases, where resolution of the question to be certified is outcome determinative of the case, and where the state supreme court has yet to have an opportunity to illuminate a clear path on

the issue." *Id.* at 813. When considering certification, we are mindful of the state courts' already busy dockets. *See id.* We "consider several factors when deciding whether to certify a question," *State Farm Mut. Auto Ins. Co. v. Pate*, 275 F.3d 666, 671 (7th Cir. 2001), including whether the issue "is of interest to the state supreme court in its development of state law," *id.* at 672. However, "'questions that are tied to the specific facts of a case are typically not ideal candidates for certification. Thus, if certification would produce a fact bound, particularized decision'" without broad precedential significance, certification is generally inappropriate. *Thomas v. H & R Block E. Enters., Inc.*, 630 F.3d 659, 667 (7th Cir. 2011) (quoting *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1101 (7th Cir. 2008)).

Recent decisions provide guidance for determining whether to certify questions to a state's highest court. In *Chicago Teachers Union, Local No. 1, American Federation of Teachers v. Board of Education of the City of Chicago*, 662 F.3d 761 (7th Cir. 2011) (per curiam), we certified three questions involving whether Illinois law gave tenured teachers who were laid off for economic reasons the right to be re-hired when openings arose, or gave them the right to certain recall procedures. *Id.* at 764-65. Certification was appropriate because no Illinois court had considered the issues; the district court had issued an injunction, which meant that the state court would not have the opportunity to correct our view of Illinois law if it was incorrect; and the issue was "one of substantial and ongoing importance." *Id.* at 764. In *George v. National Collegiate Athletic Ass'n*, 623 F.3d 1135 (7th

Cir. 2010) (per curiam), we certified questions about whether the NCAA's ticket-distribution scheme, which was used to sell tickets for multiple events, constituted a lottery in violation of Indiana law. *Id.* at 1136. We noted that the question was "a close one" and "our holding could have far-reaching effects on sports-ticket-distribution systems utilized by the NCAA and others." *Id.* at 1137. We certified questions involving issues of pecuniary loss under Wisconsin's Lemon Law in *Tammi v. Porsche Cars North America, Inc.*, 536 F.3d 702 (7th Cir. 2008), because the decision had importance throughout the state for consumers and manufacturers and the issue was of vital public concern. Although we dealt with the specific lease provisions and specific facts, the damages sought were not unique in the context of an automobile lease and the issues were likely to recur. Moreover, the answers to the certified questions depended heavily on legislative intent and policy considerations that we thought were better left to decision by the state court. *Id.* at 713.

The question of the plaintiffs' employment status under Kansas law is outcome determinative and we are unguided by any controlling Kansas Supreme Court precedent. The question appears to be a close one. And the issue is of great importance not just to this case but to the structure of the American workplace. The number of independent contractors in this country is growing. Karen R. Harned et al., *Creating a Workable Legal Standard for Defining an Independent Contractor*, 4 J. Bus., Entrepreneurship & L. 93, 96 (2010) (increasing by 25.4% from February 1999 to February 2005). There are several eco-

nomic incentives for employers to use independent contractors and there is a potential for abuse in misclassifying employees as independent contractors. *Id.* at 94. Employees misclassified as independent contractors are denied access to certain benefits and protections. Jill Pedigo Hall, *Leveling the Playing Field for Employers?* 53 No. 6 DRI For the Defense 45 (June 2011); Todd D. Saveland, *FedEx's New "Employees": Their Disgruntled Independent Contractors*, 36 Transp. L.J. 95, 96 (2009). Misclassification results in significant costs to government: "[B]etween 1996 and 2004, $34.7 billion of Federal tax revenues went uncollected due to the misclassification of workers and the tax loopholes that allow it." 156 Cong. Rec. S7135-01, S7136 (daily ed. Sept. 15, 2010). And misclassification "puts employers who properly classify their workers at a disadvantage in the marketplace[.]" Vice President Joe Biden, quoted in Press Release, John Kerry, *White House Endorses Legislation to Close Tax Loophole That Hurts Workers and Businesses* (Sept. 15, 2010), *available at* http://kerry.senate.gov/press/ release/?id=cd7f5a6e-7feb-41ae-8e8f-6004669821fc (last visited July 9, 2012). FedEx has approximately 15,000 delivery drivers in the U.S. Michael G. Petrie, *FedEx Doesn't Deliver Workers' Compensation Benefits*, 15 No. 3 Conn. Emp. L. Letter 4 (March 2007). This case will have far-reaching effects on how FedEx runs its business, not only in Kansas but also throughout the United States. And it seems likely that employers in other industries may have similar arrangements with workers, whether delivery drivers or other types of workers. Thus, the decision in this case will have ramifications beyond this particular case

and FedEx's business practices, affecting FedEx's competitors and employers in other industries as well.

Although we are presented with a particular contract and specific facts and circumstances, this appeal requires an interpretation of the meaning of "employee" under the KWPA in light of the Kansas public policy of protecting workers' rights to their wages and benefits. Under these circumstances, we believe that the Kansas Supreme Court is in a better position than we to say what Kansas law is and should have the first opportunity to address the issues before us. Certification would further the interests of cooperative federalism.

## II.

We respectfully request the Kansas Supreme Court, in an exercise of its sound discretion, to answer the following certified questions:

1. Given the undisputed facts presented to the district court in this case, are the plaintiff drivers employees of FedEx as a matter of law under the KWPA?

2. Drivers can acquire more than one service area from FedEx. *See* 734 F. Supp. 2d at 574. Is the answer to the preceding question different for plaintiff drivers who have more than one service area?

We invite reformulation of the questions presented, if necessary, and nothing in this certification should be read to limit the scope of the inquiry to be undertaken by the Kansas Supreme Court. Further proceedings in

this court are stayed while this matter is under consideration by that court.

The clerk of this court shall transmit the briefs and appendices in this case as well as a copy of this opinion under official seal to the Kansas Supreme Court, and at that court's request, will transmit the full record.

QUESTIONS CERTIFIED.