No. 30,044.

Eula Shay et al., *Appellees*, v. Burton Hill, as The Topeka Rendering Company, and Employers Casualty Company, *Appellants*.

(299 Pac. 263.)

Opinion filed May 9, 1931.

*Thomas F. Doran, Clayton E. Kline, Harry W. Colmery* and *M. F. Cosgrove,* all of Topeka, for the appellants.

*Randal C. Harvey,* of Topeka, for the appellees.

The opinion of the court was delivered by

Burch, J.: The proceeding was one by dependents for compensation for death of a workman. The commissioner of compensation denied compensation on the ground the deceased was an independent contractor. On appeal the district court held the deceased was not an independent contractor, and awarded compensation. The employer and the insurance carrier appeal.

Burton Hill collected bodies of dead animals throughout the territory lying within 100 miles of Topeka, and converted the carcasses into merchantable products at his factory in Topeka. Charley Shay went out after carcasses designated by Hill, and hauled them to the factory. Shay furnished his own autotruck, equipped and operated

it at his own expense, and was paid a price per head for hauling large animals and a price per pound for hauling small ones. The general practice was to pay him weekly, but he could draw compensation whenever he desired. While returning to the factory with a truck load of dead animals, Shay was instantly killed when his truck collided with another truck at a highway intersection. Shay's dependents made a claim for compensation against Hill, with the result stated.

The single question in the district court was whether Shay was an independent contractor. That is not the question before this court. In compensation appeals this court has jurisdiction with respect to questions of law only. While this court has the same transcript before it the district court had, it is not the province of this court to determine whether the evidence, duly weighed and duly considered in the light of the legal definition of independent contractor, supports one conclusion better than another. The question here is: Was there evidence, whether opposed or not, warranting a reasonable inference, although a contrary inference might reasonably be drawn, to sustain the judgment of the district court?

There is testimony in the record which the district court might have discounted. For example, numerous assertions of no control over truck drivers, doubtless intended to be quite probative, gave no information regarding the important matter of right to control, and assertions of liberty of truck drivers referred to conduct in fact subject to understood regulative customs to which they were expected to conform. There is testimony in the record which the trial court may have disregarded as conclusions designed to help Hill. For example, a witness testified that Shay's employment was like a certain class of work which is done by independent contractors. There was testimony which the district court may not have believed. For example, a truck driver not at the plant, who was the next man out, would be notified by telephone; a witness said the driver would be called to see if he had quit. There was testimony with respect to facts much emphasized—privilege of truck men to do other work, to decline a particular turn, and to report irregularly in the morning, which in view of the nature of the business and the necessary method of conducting it, meant little or nothing with respect to whether Shay was an employee or an independent contractor. In independent contractor cases, from *Milligan v. Wedge,* 12 A. & E. 737 (1840) to *Weaver v. Shanklin Wal-*

*nut Co.,* 131 Kan. 771, 293 Pac. 950 (December, 1930), whether there was exercise of an "independent employment"—that is, a distinct trade, business, or calling—has generally been considered important in determining character of relation.  In their brief appellants interpret the evidence as showing Shay was exercising the distinct vocation of what might be called carcass carrier.  There was no testimony that Shay so held himself out to the public, and the testimony was conclusive that Shay was one of a few persons who would consent to do Hill's hauling.  Much is made of facts which the district court may have regarded as quite unimportant.  There was testimony that sometimes a hauler would have somebody else drive his truck.  The employment was not one requiring special skill and competence, such as a perfume manufacturer demands of his scent tester; and the fact that a laborer gets another laborer to do his work temporarily does not convert him into an independent contractor.  These observations respecting the testimony are illustrative, and the result is, this court does not know what the district court regarded as established facts material to a decision of the controversy.

Turning to the law, it may be assumed the district court applied the "right of control" test recognized by courts generally and by this court.  The American Law Institute's definition of independent contractor, and comment on the definition, follow:

"Sec. 6.  An independent contractor is a person who undertakes to execute certain work or to accomplish a stipulated result for another, under such circumstances that the right of control of the doing of the work, and of the forces and agencies employed in doing it, is in the contractor.

"Comment: (*a*) The characteristics of the independent contractor are that he is a person (usually carrying on a distinct occupation) who for a stipulated compensation (usually a lump sum) undertakes to do a piece of work (usually of some magnitude) by his own forces and instrumentalities (usually supplying labor and materials), being responsible to his employer for the stipulated results, but (essential characteristic) being left in control of the operation of the forces and instrumentalities by which the stipulated result is to be accomplished."   (Agency, American Law Institute Restatement, Part 1, ch. 1, § 6.)

The right of control test breaks down in some classes of employment, there are better tests for some classes of employment, and the test is such a blind guide that different courts continually reach different conclusions when professing to apply the test to substantially identical fact situations.   (28 Mich. Law Rev. 365, February,

1930; 29 Mich. Law Rev. 519, February, 1931.) Therefore the test should not be mechanically applied when some freedom of action is found, as in this instance, in a department of an organized business.

Burton Hill testified as follows:

"I am engaged in operating the Topeka Rendering Works, and have been for the last twenty-two years, which business consists of removing dead stock and rendering same; have a factory for that purpose; Mr. Shay was hauling for me in September, 1929, as also were Gilbert Henry, Bob Barnes, and Spickard. . . . I oversee the work generally, and Mr. Hagan had charge of the office and of the men who did the hauling, . . . He had control of those whom I engaged to do hauling, and had that control in September, 1929. . . . Carcasses are hauled up to 100 miles, but seldom go that far. The busy season is the summer and fall. It varies from day to day and week to week, and some days there will be more hauling than others. . . . There are a comparatively small number of people who engage in hauling dead animals, and there are others who haul in to us besides the men who haul for us, and we have enough work to keep the three men pretty busy."

J. L. Hagan testified as follows:

"I am employed by the Topeka Rendering Works, operated by Burton Hill, and have been since November, 1928, having charge of the truck drivers, the books, and the office; was acquainted with Mr. Shay, who hauled for the company.

"Q. Was he one of the truck drivers whom you just said you had charge of? A. Yes.

.    .    .    .    .    .    .    .    .    .    .    .    .

"Frazier's employment is as stenographer and telephone operator. . . . The business of hauling carcasses is seasonal, in the spring or after April 1, and through to the first of November, it is heavier than the rest of the time. For six months of the year it is practically double what it is the other six months. . . .

"There are three men hauling for the firm now, and had four when Shay was there. . . . Around Topeka those who will haul dead animals are few and far between. . . . The business of the Topeka Rendering Company consists in receiving orders and notice of animals that die in the surrounding country, giving the orders out to the truck drivers, who bring the business in; about 30 per cent is converting dead animals into merchantable products, and 70 per cent is packing products from live animals shipped in over the railroads. . . . About 30 per cent of that [the whole business] is dead animals picked up. In that phase of the business it is necessary to have a constant supply of them. For that purpose we advertise for dead animals, and we now pay for them, but at the time of the accident we did not pay for them. The truck drivers now determine the price, and pay for them when they pull them in their trucks, drawing a sight draft on our [form of] drafts.

.    .    .    .    .    .    .    .    .    .    .    .    .

"I have been with the Topeka Rendering Works since November, 1928, and I am familiar with their business; . . . hauling has been a regular

part of the business, and the same men have been doing that work, with occasional changes, irregularly since I have been there."

Bob Barnes testified as follows:

"I am employed by the Topeka Rendering Works, and have been for five or six years, doing the same kind of work Shay was doing."

Jack Spickard testified as follows:

"I am engaged in hauling dead animals for Burton Hill, of the Topeka Rendering Works, and have been for about sixteen or eighteen months. I knew C. L. Shay, who did the same work as I am doing. Barnes does the same work."

Mrs. Shay testified as follows:

"At previous times when Mr. Shay worked for Mr. Hill, before his first injury, he did some other work for other people, and hauled some coal. Mr. Shay did not do any other work after he went back to work for Hill in April or May, 1929. He went to work at a regular time of day, at seven o'clock in the morning; he worked seven days in the week, and returned at different times, from early in the evening to as late as midnight."

The trial court might have considered this evidence as indicating a crew of employed haulers, in charge of and under the control of Hagan, kept reasonably busy doing a regular part of the business of the concern producing 30 per cent of the total business, and not as indicating a number of independent contractors reporting to the factory day by day for contracts to transport a dead horse from here, a dead cow from there, and a dead pig from yonder, and on completion of the contracts receiving—not more directions or orders, but more contracts.

The calls to remove dead animals that came to Hill's office were in response to extensive advertising. Hagan testified for Hill as follows:

"Q. I show you what I will call an 'order book,' and . . . ask you if you know what this book is? A. Yes, sir.

"Q. What is it? A. That is the book which we used to list orders received over the telephone for dead animals. . . . This shows the orders which we gave Mr. Shay to haul the day he was killed. They were to Jess Campbell's for two cows, 2 miles north and ¾ west of Whiting, Kan.; a horse at W. L. Simpson's, 5 miles west and one north of Horton; and to F. S. Williamson's, east of Denison on 24. I received these orders over the telephone, [and] as was the customary method, wrote them in the book. Well, the first driver that shows up there, I just copy this on a slip of paper and hand it to him, and he goes after it. But I write the driver's name on the book, and deliver the slip to him."

This testimony regarding the manner in which a hauler gets a

"contract" does not fully cover the subject. There were long hauls and short hauls, and the haulers agreed on a rule of "first in, first out," such as prevails with respect to certain employees at railway division points. Hagan testified as follows:

"Q. You probably have heard some testimony here about this 'first in, first out' practice. Do you know anything about that? A. Well the drivers thought they weren't getting an even shake on it, and they thought it would be better to have some kind of an arrangement among themselves. They would come to the office there and suggest we try to coöperate with them on 'first in, first out,' and since that time we have tried to coöperate with them, but we haven't let it hurt the business."

### Barnes testified as follows:

"Just describe what you do in getting these orders. You go up to Mr. Frazier and ask him if he has got any orders? A. No, he will let you know. You don't have to ask him. He will call you.

"Q. Does he call all the haulers, or just call particular ones? A. Oh, no; just whichever one is up first.

"Q. You mean they take it by turns? A. Yes, sir; first in, first out."

### Spickard testified as follows:

"Q. Suppose you don't get down till 11 o'clock in the morning, and before you do get there an order comes in that is your turn, do they try to get you, call you about it? A. Yes."

### Mrs. Shay testified as follows:

"Mr. Shay went to work every morning about seven o'clock. On some occasions he would be a little after seven, and on those occasions some one from the plant would call; sometimes Mr. Hill, sometimes one of the other fellows; couldn't say which. If they called and asked if Mr. Shay was there, I would say, he is here, or he has just left, or tell them if he was on the way to work. I don't think they ever gave me any orders for Mr. Shay. On one occasion Mr. Hill called about seven or seven-thirty in the evening, and left word for Mr. Shay to call him."

### Barnes testified as follows:

"Q. How do you decide whether you get a one-mile haul or a hundred? A. We don't decide. We just take it as they give it to us.

"Q. Have you got anything to say about that? A. No, sir."

### Spickard testified as follows:

"When I get a haul of one cow for 75 or 100 miles, we just got to go and get it. We don't refuse. If anybody refused to go, nothing would happen; some one would go. I have never known of anyone refusing."

From the evidence the district court might have concluded that in winter, when there was little hauling to do for Hill, the haulers did not remain idle. When Hill's work was irregular and not very

active, and perhaps at other times, the haulers took jobs of hauling. Hill testified haulers "were free to do other hauling as long as it did not interfere with our work."

A hauler might not report at a particular hour, and if he had been out late at night, he was not likely to report early the next morning. Spickard testified as follows:

"A. Well, if you get out and get your stuff and get—maybe you get back in, and they give you an order, and you go out, and maybe not get back to 3 o'clock in the morning. I have been out all night.

"Q. What happens if you decide you are not going down there to-morrow morning? A. I just keep quiet and say nothing. They generally call me on the phone. I have told my wife to tell 'em I am sick, and all kind of excuses; make up every kind of excuse to keep from going."

For obvious reasons of business prudence the haulers were not disciplined. Hill testified they were kept pretty busy, and there was no testimony that his business ever suffered because he could not depend on his crew of haulers.

The district court might have inferred from all the foregoing testimony that, under the system of operation of the Topeka Rendering Works, haulers were workmen who were in fact subject to call and who were under well-understood obligation to respond to calls.

When a hauler got a "contract," what was his freedom in executing it? Hill said, "My interest consists in getting the orders out and having the stock delivered at the plant." It was "expected," however, that the hauler would go at once, and return promptly. There was no promulgated rule to that effect, and the faster a hauler worked the more he earned. But quick work was a need of the business—the need to minimize putrefaction—and it was inferable that the constraint of the known and necessary custom and practice had a practical effect equivalent to a direction. Hagan testified that when he was told Shay had been killed, his first thought was to get help over there and get the dead animals Shay was hauling.

The slip given to a hauler gave the location of the dead animal. Hill said the hauler was "supposed" to go to the owner of the land where the animal was. It is a fair inference a hauler understood what it meant when his employer "supposed" or "expected" he would conduct himself in a certain way.

When the hauler reached the animal to be transported he was not permitted to handle it according to his own methods and by instrumentalities of his own choice. He was not allowed to cut up the

animal in order to load it. He was required to load it and bring it in just as it was when he found it—whole, or as it then might be mutilated. To do this the hauler was obliged to have special equipment, a hoist, to draw animals up into his truck. Barnes and Spickard had hoists belonging to Hill. Shay did not have a hoist. Barnes said Hill wanted Shay to have one, and Barnes loaned Shay an old hoist which Barnes did not use after reëquipping his own truck with Hill's hoist. The result is that in doing the particular thing he went out to do—getting the dead animal—the hauler was obliged to obey the will of his employer, and not his own will.

Place and manner of delivery at the factory and important incidents to delivery were governed by prescribed regulations, and the freedom of a hauler to execute his "contract" according to his own will consisted essentially in choosing his way out and back. Hill said, "Those boys all know the road conditions."

In the case of *McKinstry v. Coal Co.*, 116 Kan. 192, 225 Pac. 743, the opinion reads:

"The defendant was operating a coal mine in Cherokee county. The plaintiff with his boy was digging coal for the defendant at sixty cents for each mine car of coal produced. The plaintiff furnished his own tools and supplied his own material, such as powder, fuses, paper, etc., to be used in mining coal. The defendant argues that this made the plaintiff an independent contractor and took him out of the operation of the workmen's compensation act. . . . The plaintiff was an employee within the meaning of the workmen's compensation act." (pp. 193, 194.)

Appellants undertake to distinguish this case by giving their interpretation of the evidence relating to privilege to work or not, to refuse a particular haul, and to substitute a driver. This effort to distinguish does not break the force of the decision regarding inconclusiveness of piece-work pay and the furnishing of instrumentalities as factors determinative of nature of employment. The factors referred to by appellants have been discussed in their relation to the whole situation as the district court might have viewed it.

Whether Shay was an employee or an independent contractor was distinctively a matter of inference, and without pursuing the subject further it is sufficient to say there was evidence from which the district court might fairly infer that Shay was an employee within the protection of the workmen's compensation act.

The judgment of the district court is affirmed.

HARVEY, J., not sitting.