637 P.2d 1154

**Melvin G. KUHN, Claimant-Appellant,**

v.

**BOX CANYON LIVESTOCK, INC.,
Employer, Defendant-Respondent.**

No. 13418.

Supreme Court of Idaho.

Oct. 16, 1981.

Rehearing Denied Dec. 22, 1981.

Dennis S. Voorhees of Walker & Spink, Twin Falls, for claimant-appellant.

John C. Hohnhorst of Hepworth, Nungester & Felton, Harry DeHaan of Benoit & Alexander, Twin Falls, for defendant-respondent.

McFADDEN, Justice.

Claimant-appellant Melvin G. Kuhn filed a claim with the Industrial Commission seeking workman's compensation benefits for injuries sustained when the employer's loaded bulk milk truck he was driving overturned on the interstate highway near Eden, Idaho. Appellant was employed by defendant-respondent Box Canyon Livestock, to haul milk from respondent's dairy near Wendell to a processing plant operated by Kraft, Inc. near Rupert. Appellant was also to return-haul whey, a by-product of dairy processing, from the Kraft plant to respondent's dairy.

Appellant's duties included pumping the milk from respondent's holding tanks into the 6,000 gallon tank of respondent's tractor-trailer truck, driving the truck to Kraft where the truck was weighed and the milk, following inspection and acceptance, unloaded by Kraft employees, and returning to respondent's dairy with whey which appellant then discharged into feeding troughs. Appellant was also to clean the truck tank at night and to take care of refueling and minor maintenance.

Unlike most south-central Idaho dairy operations, respondent had an employee, appellant, haul the milk from its storage tanks to the processor; others hired independent "contract haulers." The relatively few producers of dairy products who did their own hauling were primarily the larger operations who could affect an economic savings by using in-house haulers. Some processors required the use of contract haulers but Kraft did not.

Contract haulers are essentially independent contractors providing a transport service to dairy farmers, and come within the scope of the workman's compensation act. *Accord, Backsen v. Blauser,* 95 Idaho 811, 520 P.2d 858 (1974). These haulers can sample, inspect and grade the milk upon loading, but are subject to regulation under the Idaho Code and must obtain a milk hauler's permit issued by the state. Producer-haulers are not allowed to do these activities, and need not have a hauling permit; as previously noted, the sampling and grading is done by the processor's employees at the time of delivery rather than by the hauler at the time of loading. Another dissimilarity is that producer-haulers may return haul whey in the same truck used to haul milk, but contract haulers may not use their trucks for anything other than milk, at least absent specific authorization by the state.

The Industrial Commission found that respondent's hauling activity, within which appellant's injury occurred (i.e., while he

was hauling the milk to Kraft) was excluded from workman's compensation coverage under the "agricultural pursuits" exemption, I.C. § 72–212(8),[1] and therefore denied benefits. We disagree with the Commission's conclusion and reverse the order.

A similar question concerning the agricultural exclusion from workmen's compensation coverage was presented in *Goodson v. L. W. Hult Produce Co.*, 97 Idaho 264, 543 P.2d 167 (1975). There the claimant contended that the employer, admittedly engaged in the agricultural pursuit of raising potatoes, entered into another, separate occupation which was not within the § 72–212(8) exclusion and that the claimant's injury, sustained while employed in this separate enterprise, was therefore compensable. This court stated at the outset in *Goodson*:

"This court repeatedly has recognized the policy that 'there should be accorded to the Workmen's Compensation Act a broad and liberal construction, that doubtful cases should be resolved in favor of compensation, and that the humane purposes which these acts seek to serve leave no room for narrow technical construction.' *Smith v. University of Idaho*, 67 Idaho 22, 26, 170 P.2d 404, 406 (1946). See also *Miller v. FMC Corp.*, 93 Idaho 695, 471 P.2d 550 (1970); *Kiger v. Idaho Corp.*, 85 Idaho 424, 380 P.2d 208 (1963); *Collins v. Moyle*, 83 Idaho 151, 358 P.2d 1035 (1961). A necessary corollary to the realization of the humane purposes and promotion of justice within the work-

men's compensation scheme is that all exemptions from coverage, including the one for agricultural pursuits, be construed narrowly." 97 Idaho at 266, 543 P.2d at 169.

The general rules of law governing the application of the statutory exclusion were also set forth in *Goodson*. While the principal business of the employer governs the workmen's compensation status of an employee engaged in that enterprise and in employment incidental thereto, when an employer engages in a secondary enterprise which, although it may be related to the principal business, fairly can be said to be a separate occupation, the nature of that second enterprise supplants the principal business as the governing factor in determining the status of an employee engaged in the secondary separate enterprise. *Goodson v. L. W. Hult Produce Co., supra*, 97 Idaho at 267, 543 P.2d at 170. See also *Manning v. Win Her Stables, Inc.*, 91 Idaho 549, 428 P.2d 55 (1967); *Hubble v. Perrault*, 78 Idaho 448, 304 P.2d 1092 (1956). Here it is clear, and the parties have stipulated, that the principal business of respondent is an agricultural pursuit, i.e., dairy production. The issue presented is whether the milk hauling activities engaged in by respondent, within which the appellant was employed and injured, are of a sufficiently separate nature as to supplant the principal business in determining the workmen's compensation status of appellant. We conclude that these activities do constitute such a separate enterprise.

---

1. I.C. § 72–212(8):

 "Exemptions from coverage.—None of the provisions of this law shall apply to the following employments unless coverage thereof is elected as provided in section 72–213, Idaho Code.

 . . . .

 (8) Agricultural pursuits. Agricultural pursuits, as used herein, shall include the raising or harvesting of any agricultural or horticultural commodity including the raising, pelting, shearing, feeding, caring for, training and management of livestock, bees, poultry and fur-bearing animals and wildlife raised in captivity, on inclosed and public ranges."
 It should also be noted that we disagree not with the Commission's findings of fact, (except as noted below), nor with its statements setting forth the applicable rules of law. Rather we

disagree with the conclusions of law entered by the Commission concerning the separateness of respondent's milk hauling enterprise and the finished nature of the milk as it came to rest in the dairy's holding tanks. See discussion *infra*. It is in regard to the question of milk as a finished farm product that we disagree with the Commission's finding of fact to the effect that the raw milk was incapable of sale for consumption. This finding conflicts with the testimony of the chief of the state's Bureau of Dairying stating that the milk could be sold if it met certain standards and respondents obtained a license. And insofar as the finding could be interpreted as meaning that the milk was not capable of consumption, this conflicts with evidence before the Commission that it could be, and in fact was, consumed.

Respondent contends that by hauling milk it was merely taking its agricultural products to market and thus the activity was not separate but rather incidental to the primary agricultural enterprise, citing *In re Farmers Cooperative Creamery Co.*, 66 Idaho 70, 75, 155 P.2d 762, 764 (1945), as at least implicitly recognizing the agricultural nature of such activity.[2] As noted in *Goodson* :

> "In keeping with the long-standing policy of narrowly construing the agricultural exemption from workmen's compensation, this court will examine closely all claims that a secondary business is merely incidental to a principally agricultural operation." 97 Idaho at 267, 543 P.2d at 170.

While in 1945 producers might have been forced to singly or collectively transport their milk to processors in order to culminate their agricultural pursuit, other options are now available to contemporary milk producers. Many, if not most, Idaho dairies hire contract haulers to transfer the milk from the dairies' holding tanks to the processor. Testimony before the Commission indicated that the point of sale in such cases occurs at loading, that is, if the hauler fails to properly check the milk at that time and it is later determined that the milk is spoiled or otherwise contaminated, the hauler bears the loss. Another option regarding the disposition of the milk deposited nightly in respondent's holding tanks was to sell the milk directly from those tanks to the public. While respondent could not so sell the milk under the circumstances as they existed, it could do so if it obtained a license from the state and met certain sanitation requirements. Respondent allowed its employees to consume the milk from the tanks, but it chose not to pursue this option for the sale of the milk. As noted, respondent chose yet another alternative by self-hauling the milk to Kraft and witnessing at the point of sale when Kraft sampled, inspected and accepted the milk.

The farmer in *Goodson*, engaged in raising seed potatoes, set up a marketing enterprise to dispose of certain oversize potatoes sorted from among the seed potatoes. This court stated:

> "While the removal of oversize potatoes from those which are to be used for seed may be incidental to Hult's principal business, the disposition of them thereafter clearly is not. An expert in the seed potato business testified before the Industrial Commission that options regarding disposition of oversize potatoes ranged from discarding them to marketing them in various manners. Hult sold some oversized potatoes in sacks as commercial potatoes directly from the cellars, but he had most of them transported to the warehouse from which they were shipped by rail after further handling. By choosing to have the oversized potatoes transported to the warehouse, prepared for shipment, and loaded onto railroad cars along with the potatoes of other growers, Hult embarked upon a marketing enterprise distinct from his seed potato operations." 97 Idaho at 267–268, 543 P.2d at 170–171.

In the earlier case of *Mulanix v. Falen*, 64 Idaho 293, 130 P.2d 866 (1942), the employer, a fruit grower, hired an individual to deliver his peaches from the Idaho orchard to a buyer in Wyoming. This court held that the peaches were a finished farm product as of their harvesting and that the Industrial Accident Board was justified in concluding that their delivery, distinct from their production and harvesting, was not agricultural. In both cases, the choice to enter into the enterprise of disposing of farm products included the loss of the agricultural exemption which excluded from the workmen's compensation act employment related to the raising and harvesting

**2.** It should be noted that *Farmers Cooperative Creamery* is not only of dated vintage and the statements therein thus less persuasive in light of more recent analyses, the case also concerned a different area of law, i.e., construction of the statutory exemption for "agricultural labor" within the context of the Unemployment Compensation Act. This statutory language, and its resultant judicial construction, is not identical with that involved in the workmen's compensation area presently facing the court.

of the commodities. The activity engaged in by the respondent here, transporting the milk to the processor, was not an incidental or necessary adjunct of the production of the milk but rather, as in *Goodson* and *Mulanix*, was a decision to engage in one of a number of alternatives available for the ultimate disposition of the farm product. This activity was similar to the sole enterprise of the employer in *Backsen v. Blauser,* 95 Idaho 811, 520 P.2d 858 (1974), *i.e.,* trucking agricultural commodities, as well as identical to the occupation of contract hauling in the dairy industry. It is the nature of this secondary, separate enterprise which is determinative of the workmen's compensation status of an employee injured while engaged in that enterprise, as appellant was here. *Goodson, supra; Manning, supra.*

 To determine whether this separate enterprise was covered by the workmen's compensation act, we must look to the legislative definition of the exclusion. I.C. § 72–212(8) indicates that the activities encompassed by the exclusion include "the raising or harvesting of any agricultural and horticultural commodity . . . ." This court has consistently held that a farm product is finished and passes beyond the exemption for its raising and harvesting when nothing else need be done for it to be sold, consumed, or utilized. *Goodson, supra; Backsen, supra; Mulanix, supra.* If the milk was not finished when it came to rest in the dairy's holding tanks, *i.e.,* if something else needed to be done for the milk to be sold, utilized or consumed, then activities undertaken prior to the completion of the finished product could come within the scope of the exclusion and injuries sustained while engaged in such activities would not be compensable under the act. Here, however, as noted, the milk was capable of being sold from the tanks (if the dairy so chose and obtained a license to do so or hired contract haulers to pick up the milk); it was also capable of consumption and indeed was consumed by employees of respondent; and the milk was clearly capable of utilization by processors. The fact that respondent could select one of a number of alternatives to dispose of the milk does not alter the fact that the milk was a finished product as it came to rest in the dairy's tanks where it was held at a cool temperature awaiting the choice of an alternative and actual disposition. As in *Backsen, Mulanix* and *Goodson,* the transportation of a finished agricultural product is not within the exclusion contemplated by the statute.

The order of the Industrial Commission is reversed, and the claim remanded for proceedings in conformity with this opinion. Costs to appellant.

BISTLINE, DONALDSON and SHEPARD, JJ., concur.

BAKES, Chief Justice, dissenting:

If I were the finder of fact in this case, I would find exactly as the majority has done. However, the Industrial Commission is the finder of fact, and this Court can only reverse the Industrial Commission if it has erred as a matter of law, *i.e.,* if there is no competent evidence to sustain the Industrial Commission's finding of fact. Idaho Const.Art. 5, § 9. I believe that there was sufficient evidence to support the commission's finding that the milk was not a finished product. The majority overturns the commission's finding of fact based upon the Bureau of Dairying chief's testimony that a producer could sell raw milk for consumption if the milk met certain standards and the producer obtained a license. However, there is no showing in the record of what standards the milk had to meet in order that it might be sold, and no evidence that the milk could indeed meet those standards. It is undisputed that defendant's milk was of only Grade B quality. When confronted with this fact on cross examination, the bureau chief himself admitted that there was no market for Grade B milk (or "manufacturing milk" as the bureau chief termed it), except for selling it to a processor. There is clearly sufficient evidence to support the commission's factual determination that the milk could not be utilized by the defendant until sold to the processor, and was therefore not a finished product. Certainly, if a single unsworn and unverified

letter was sufficient evidence to sustain the commission's findings in the case of *Mager v. Garrett Freightlines*, 100 Idaho 469, 600 P.2d 773 (1979), then there is sufficient evidence in this case that it should also be affirmed.