(250 P.3d 825)
No. 104,047

MARGARET LEANN OLDS-CARTER, *Appellee,* v. LAKESHORE FARMS, INC., and THE KANSAS WORKERS COMPENSATION FUND, *Appellants.*

Opinion filed February 18, 2011.

*Matthew R. Bergmann*, of Frieden, Unrein, Forbes & Biggs, L.L.P., of Topeka, for appellant Kansas Workers Compensation Fund.

*John D. Jurcyk* and *Brent M. Johnston*, of Roeland Park, for appellant Lakeshore Farms, Inc.

*Timothy J. Pringle*, of Eschmann & Pringle, P.A., of Topeka, for appellee Margaret Leann Olds-Carter.

Before GREENE, P.J., GREEN and STANDRIDGE, JJ.

GREEN, J.: Margaret LeAnn Olds-Carter was injured in an accident while driving a semi-truck that she leased from Lakeshore Farms, Inc. (Lakeshore). Olds-Carter was granted workers compensation benefits from the administrative law judge (ALJ). The ALJ's decision was affirmed by the Appeals Board for the Kansas Division of Workers Compensation (Board). Lakeshore and the Kansas Workers Compensation Fund (the Fund) appeal the Board's decision, contending that the present claim is not subject to the Kansas Workers Compensation Act because Olds-Carter was engaged in an agricultural pursuit when she was injured, because Lakeshore's payroll is insufficient to trigger coverage under the Act, and because Olds-Carter was an independent contractor, not an employee of Lakeshore. The Fund also appeals the Board's decision that it is obligated to pay the award because Lakeshore is insolvent. Finding no reversible error, we affirm.

Lakeshore is a company owned by Jonathan Russell, who is the company's sole officer, director, and shareholder. Lakeshore owns certain equipment, including vehicles, semi-trucks, combines, tractors, planters, and sprayers. Russell owns farmland and pays Lakeshore for the use of its equipment. Lakeshore also leases its semi-trucks to individuals who haul loads of grain and other items for Russell and for various brokers. Lakeshore pays for the trucks' insurance, licensing, permits, fuel, repairs, and maintenance, and keeps 75 percent of the compensation the drivers earn from hauling. After the brokers make payments directly to Lakeshore, the drivers earn the remaining 25 percent of each haul. The drivers

are required to gross $2,400 per month in order to cover their obligations under the lease.

On March 5, 2007, Olds-Carter began driving a semi-truck for Lakeshore under an oral lease agreement. Her duties included loading and hauling grain or sand in a grain wagon. On July 18, 2007, Olds-Carter was driving her truck to pick up a load of corn at an elevator for a broker. En route, Olds-Carter was injured after she lost control of her truck. She was ultimately diagnosed with a 20 percent compression fracture to her L2 vertebra.

Olds-Carter filed a workers compensation claim, alleging that the accident occurred during the course of her employment with Lakeshore. In attempting to avoid liability, Lakeshore argued that Olds-Carter was an independent contractor, not an employee. Following a hearing, the ALJ found that although the evidence presented contained elements both of an independent contractor relationship and an employer and employee relationship, the totality of the evidence indicated that Olds-Carter was an employee of Lakeshore. The ALJ also found that there was coverage under the Act because Olds-Carter was not engaged in an agricultural pursuit when she was injured and because Lakeshore had a payroll of over $20,000. The ALJ determined that Olds-Carter sustained a 38.5 percent work disability based upon a 38 percent task loss and a 39 percent wage loss, entitling her to 159.78 weeks of permanent partial disability compensation and a total award of $50,230.04, assessed against both Lakeshore and the Fund.

Lakeshore and the Fund petitioned the Board for review. After reviewing the evidence, the Board entered an order affirming in part and modifying in part the ALJ's award. The Board concluded that Lakeshore's trucking operation did not constitute an agricultural pursuit, that Lakeshore had a sufficient payroll to bring it under the jurisdiction of the Act, and that the evidence more heavily weighed towards a finding that Olds-Carter was an employee of Lakeshore, rather than an independent contractor. The Board also held that there was sufficient evidence in the record to establish that Lakeshore was unable to pay Olds-Carter's workers compensation benefits; thus, the Fund was responsible for paying the benefits. Finally, the Board modified the ALJ's award to reflect that

Olds-Carter suffered a 60 percent permanent partial disability, for a total award of $84,125.41.

*Standard of Review*

Under the Workers Compensation Act (Act), K.S.A. 44-501 *et seq.*, an appellate court's standard of review is statutorily controlled by the Kansas Judicial Review Act (KJRA), K.S.A. 2009 Supp. 77-601 *et seq.* See 2009 Supp. K.S.A. 44-556; L. 2009, ch. 109, secs, 23-30. A recent decision of our Supreme Court held that the 2009 changes to the standard of review are to be given prospective application only because the KJRA contains a savings clause; thus, the 2009 changes are to be applied to agency decisions issued on or after July 1, 2009. *Redd v. Kansas Truck Center*, 291 Kan. 176, Syl. ¶ 1, 239 P.3d 66 (2010). The Board's decision here was issued on February 26, 2010. Therefore, the 2009 KJRA changes apply to the present case.

The KJRA provides that appellate courts review the Board's factual determinations to verify that they are supported by substantial competent evidence "in light of the record as a whole." K.S.A. 2009 Supp. 77-621(c)(7); *Herrera-Gallegos v. H & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, 362, 212 P.3d 239 (2009). The language "in light of the record as a whole" is statutorily defined to mean

"that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 2009 Supp. 77-621(d).

Substantial evidence in a workers compensation case is evidence that possesses something of substance and relevant consequence that induces the conclusion that the award is proper; it furnishes a basis of fact from which the issue raised can reasonably be resolved. *Redd*, 291 Kan. at 183-84. Stated another way, substantial evidence is "such evidence as a reasonable person might accept as being

sufficient to support a conclusion." *Herrera-Gallegos*, 42 Kan. App. 2d at 363.

This court has interpreted the 2009 legislative changes to require appellate courts to examine whether the evidence supporting the Board's decision has been so undermined by other evidence that it is insufficient to support the Board's conclusion. 42 Kan. App. 2d at 363. The 2009 legislative changes also abrogated the negative findings standard in workers compensation cases. See K.S.A. 2009 Supp. 77-621(c)(7). In the present case, the Board made several negative findings: that Lakeshore failed to show that Olds-Carter was engaged in an agricultural pursuit, that Lakeshore failed to show that its payroll was insufficient to invoke the Act, and that Lakeshore failed to show that Olds-Carter was an independent contractor. Nevertheless, instead of using the negative findings standard, we must apply the substantial competent evidence standard described earlier.

*Does the Kansas Workers Compensation Act Apply to the Present Case?*

Lakeshore and the Fund contend that the present claim is not governed by the Act because (1) Olds-Carter was engaged in an agricultural pursuit when she was injured, and (2) Lakeshore does not maintain an annual payroll threshold of $20,000.

K.S.A. 44-505 provides, in relevant part:

"(a) Subject to the provisions of K.S.A. 44-506 and amendments thereto, the workers compensation act shall apply to all employments wherein employers employ employees within this state except that such act shall not apply to:

(1) Agricultural pursuits and employments incident thereto, other than those employments in which the employer is the state, or any department, agency or authority of the state;

(2) any employment, other than those employments in which the employer is the state, or any department, agency or authority of the state, wherein the employer had a total gross annual payroll for the preceding calendar year of not more than $20,000 for all employees and wherein the employer reasonably estimates that such employer will not have a total gross annual payroll for the current calendar year of more than $20,000 for all employees, except that no wages paid to an employee who is a member of the employer's family by marriage or consanguinity shall be included as part of the total gross annual payroll of such employer for purposes of this subsection . . . ."

*Is the Board's Finding that Olds-Carter Was Not Engaged in an Agricultural Pursuit When She Was Injured Supported by Substantial Competent Evidence?*

Lakeshore and the Fund first contend that the Act is not applicable to the present case because Lakeshore is an essential part of Russell's farming operation and was established for the sole purpose of making his agricultural pursuits more effective and efficient. They maintain that the service furnished by Olds-Carter on the date of her alleged injury was 100% agriculturally related because transporting harvested crops is clearly incident to an agricultural pursuit.

Determining whether a workers compensation claimant is involved in an agricultural pursuit is a question of fact which must be decided on a case-by-case basis. *Frost v. Builders Service, Inc.*, 13 Kan. App. 2d 5, 7, 760 P.2d 43, *rev. denied* 243 Kan. 778 (1988). The *Frost* case sets out a two-step analysis for determining whether a workers compensation claimant was engaged in an agricultural pursuit when injured:

> "To determine whether a workers' compensation claimant was engaged in an agricultural pursuit at the time of injury requires a two-step analysis. The first step is to determine whether the employer was engaged in an agricultural pursuit. If the answer to this question is no, then the court may find that there is coverage. If the answer is yes, then the court proceeds to the second step, which is to determine if the injury occurred while the employee was engaged in an employment incident to an agricultural pursuit. If the answer to that question is also yes, then the employee is not covered by the Act. If the answer to that question is no, then there is coverage." 13 Kan. App. 2d 5, Syl. ¶ 2.

In addition, there are three considerations for determining whether a specific pursuit or business is an agricultural pursuit within the meaning of K.S.A. 44-505(a)(1): "(1) the general nature of the employer's business; (2) the traditional meaning of agriculture as the term is commonly understood; and (3) each business will be judged on its own unique characteristics." *Whitham v. Parris*, 11 Kan. App. 2d 303, Syl. ¶ 3, 720 P.2d 1125 (1986).

In applying the *Frost* analysis to the facts in this case, the Board held that Lakeshore's business should not be considered an agricultural pursuit:

"Here, respondent's business was leasing equipment to Mr. Russell for use in his farming operation. In addition, respondent conducted a commercial trucking enterprise. Neither a leasing company nor a commercial trucking company should be considered agricultural pursuits as that term is commonly understood. Respondent argues that it was engaged in agriculture because it leased farm equipment and its truckers hauled grain. The Board disagrees. Moreover, respondent hauled more than grain as at least one of respondent's numerous drivers, Mr. Hutton, pulled a flat bed trailer."

### 1. The general nature of Lakeshore's business

The general nature of Lakeshore's business is to purchase or lease equipment to Russell for use in his farming operation. Lakeshore also leases semi-trucks to drivers who transport grain and other items for Russell and various brokers. Lakeshore does not own any farm land.

### 2. The traditional meaning of "agriculture"

Webster's Third New International Dictionary 44 (1993) defines agriculture as "the science or art of cultivating the soil, harvesting crops, and raising livestock" or "the science or art of the production of plants and animals useful to man and in varying degrees the preparation of these products for man's use and their disposal (as by marketing)."

### 3. Lakeshore's unique characteristics

Lakeshore takes issue with the Board's characterization that it runs a "commercial trucking enterprise." Rather, Lakeshore and the Fund argue that Lakeshore is an essential part of Russell's farming operation, established for the sole purpose of making Russell's agricultural pursuits more effective and efficient.

Although Lakeshore may be essential to Russell's farming operation, the United States Supreme Court has recognized a distinction between agriculture and related, but separate and independent, business activities:

"[F]unctions which are necessary to the total economic process of supplying an agricultural product become, in the process of economic development and specialization, separate and independent productive functions operated in conjunction with the agricultural function but no longer a part of it. Thus, the question as to whether a particular type of activity is agricultural is not determined by the necessity of the activity to agriculture nor by the physical similarity of the activity

to that done by farmers in other situations. The question is whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity." *Farmers Irrigation Co. v. McComb*, 337 U.S. 755, 761, 69 S. Ct. 1274, 93 L. Ed. 2d 1672 (1949).

Lakeshore's trucking operation, while necessary to the process of transporting and delivering grain, is separately organized and independent from Russell's farming operation. The present facts are similar to those found in *Kuhn v. Box Canyon Livestock, Inc.*, 102 Idaho 658, 637 P.2d 1154 (1981), where an employee of a dairy sought workers compensation benefits for injuries sustained when the dairy's loaded milk truck overturned while the employee was hauling milk from the dairy to a processing plant. In finding that the employee was eligible for benefits, the Idaho Supreme Court held that hauling milk constituted an activity of a sufficiently separate nature so as to supplant the dairy's principal business. In so holding, the court noted that the activities performed by the employee when the injury occurred were not in the nature of creating an agricultural commodity; rather, the employee's activities were confined to transporting a completed agricultural commodity. 102 Idaho at 660-62; see also *Backsen v. Blauser*, 95 Idaho 811, 813, 520 P.2d 858 (1974) (claimant truck driver covered by workers compensation statute where employer's business consisted of transporting finished agricultural products and did not relate to " 'raising or harvesting' " agricultural products within meaning of exemption statute).

Lakeshore does not plant, cultivate, or harvest any crops. Lakeshore leases equipment to Russell for use in his farming operation and leases semi-trucks for transporting grain and other items. As noted by the Board, the trucks are not used solely to transport grain. One driver testified that he regularly hauls a flatbed trailer, and on at least one occasion, transported a boat for Russell. Clearly, Lakeshore is not engaged in agricultural pursuits as that term is commonly understood.

It stands to reason, then, that Olds-Carter's act of driving Lakeshore's truck to pick up a load of corn for a broker constituted an activity of a sufficiently separate nature from Russell's farm operation. Moreover, the load of corn that Olds-Carter was to pick up

at the elevator for the broker was a finished product. Nothing else needed to be done to the corn before it was marketed.

The case of *Mulanix v. Falen*, 64 Idaho 293, 296, 130 P.2d 866 (1942), states that the "line of demarcation between employment that is agricultural or not is extremely attenuated. The same work done under certain conditions and under certain circumstances may be agricultural and under other conditions and circumstances not." It would be incorrect to say that when Olds-Carter was injured, Lakeshore's business constituted an agricultural pursuit: the cultivating and harvesting of agricultural products. As a result, viewing Lakeshore's business as a whole, the Board's finding that Olds-Carter was not engaged in an agricultural pursuit when she was injured is supported by substantial competent evidence.

*Is the Board's Finding that Lakeshore's Payroll Was Sufficient to Bring It under the Jurisdiction of the Act Supported by Substantial Competent Evidence?*

Lakeshore and the Fund also contend the Board erred in finding that Lakeshore's annual payroll exceeded $20,000, as required for workers compensation coverage under K.S.A. 44-505(a)(2).

In holding that Lakeshore's payroll exceeded $20,000, the Board stated:

"The greater weight of the evidence establishes that at the time of claimant's accident respondent should have reasonably estimated that it would have a payroll greater than $20,000 for the calendar year. As of the date of accident claimant had earned more than $8,900. Moreover, one of respondent's other truck drivers, Gary Wheeler, testified that he received approximately $38,000 to $40,000 driving for respondent in 2006 and approximately $50,000 from respondent in 2007. In addition, respondent had several other drivers operating its trucks in 2007. In short, respondent had sufficient payroll to bring it under the jurisdiction of the Act."

The record supports the Board's findings as to the earnings of Olds-Carter and Wheeler. Neither Lakeshore nor the Fund disputes these figures. Instead, they argue that although Lakeshore's drivers may have earned more than $20,000 a year for the work they performed for various brokers, this amount does not represent Lakeshore's annual payroll. Inherent in this argument is the notion

that Lakeshore actually has no wage-earning employees because its drivers are independent contractors.

Although the issue of whether Lakeshore's drivers are employees or independent contractors will be later addressed, its resolution is not relevant with respect to the applicability of the Act.

In enacting K.S.A. 44-503, the legislature extended the Act to employees of subcontractors in order to prevent employers from evading liability under the Act by contracting with outsiders to do work which the employers have undertaken to do as a part of their trade or business. *Rodriquez v. John Russell Constr.*, 16 Kan. App. 2d 269, Syl. ¶ 3, 826 P.2d 515 (1991). In *Olivares v. Mid-Continent Specialists, Inc.*, No. 90,576, unpublished opinion filed December 24, 2003, this court affirmed the Board's holding that a contractor's payments for leased employees were properly considered in determining whether the contractor's payroll met the Fund's threshold requirement:

" 'The phrase "all employees" in K.S.A. 44-505 must be construed to include leased employees otherwise a contractor could avoid liability to statutory employees by leasing employees and arguing, as Mid-Con does in this case, that it is not subject to the Act because it does not have a sufficient payroll. Such an arrangement would subvert the provisions of K.S.A. 44-503 which is to prevent employers from evading liability under the act by the device of contracting with outsiders to do work which they have undertaken to do as part of their trade or business." Slip op. at 9.

The Act, K.S.A. 44-501 *et seq.*, is to be "liberally construed for the purpose of bringing employers and employees within the provisions of the act to provide the protections of the workers compensation act to both." K.S.A. 2009 Supp. 44-501(g). Olds-Carter and Lakeshore's other drivers performed work that was "inherent in and an integral part of" Lakeshore's business. See *Rodriguez*, 16 Kan. App. 2d 269, Syl. ¶ 4. There is uncontroverted evidence that Lakeshore's drivers met the required payroll threshold. Therefore, there is substantial competent evidence to support the Board's finding that Lakeshore had sufficient payroll to bring it under the jurisdiction of the Act.

*Is the Board's Finding that Olds-Carter Was an Employee of Lakeshore, Rather than an Independent Contractor, Supported by Substantial Competent Evidence?*

Next, Lakeshore and the Fund maintain that the Board's finding that Olds-Carter was an employee of Lakeshore, rather than an independent contractor, is not supported by substantial competent evidence in light of the record as a whole.

Although not defined in the Act, our courts have consistently defined an independent contractor as one who, in exercising an independent employment, contracts to do certain work according to his or her own methods, without being subject to the control of the party he or she contracts with, except as to the results or product of his or her own work. *Falls v. Scott*, 249 Kan. 54, 64, 815 P.2d 1104 (1991); *Krug v. Sutton*, 189 Kan. 96, 98, 366 P.2d 798 (1961).

There is no absolute rule for determining whether one is an independent contractor or an employee. Generally, each case must be determined on its own facts. See *Hartford Underwriters, Ins. Co. v. Kansas Dept. of Human Resources*, 272 Kan. 265, 270, 32 P.3d 1146 (2001); *Schroeder v. American Nat'l Bank*, 154 Kan. 721, 724, 121 P.2d 186 (1942).

Nevertheless, there are some well-recognized tests which courts have used in determining whether one is an independent contractor or an employee. Our Supreme Court has held that the principal test is based upon the control exercised: Who has the right to direct what work will be done and when and how the work will be performed? This test is commonly referred to as the "right of control" test. *Danes v. St. David's Episcopal Church*, 242 Kan. 822, 831-32, 752 P.2d 653 (1988).

Kansas courts continue to use this right of control test in determining the relationship of the party rendering the service:

"[The test is] whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished. It is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor." *Falls*, 249 Kan. at 64.

Nevertheless, the right of control test has not proved satisfactory as an exclusive determinant of the employment relationship. Other factors which Kansas courts have used in various ways to determine the employment relationship include the following:

"(1) [t]he existence of the right of the employer to require compliance with instructions;

"(2) the extent of any training provided by the employer;

"(3) the degree of integration of the worker's services into the business of the employer;

"(4) the requirement that the services be provided personally by the worker;

"(5) the existence of hiring, supervision, and paying of assistants by the worker;

"(6) the existence of a continuing relationship between the worker and the employer;

"(7) the degree of establishment of set work hours;

"(8) the requirement of full-time work;

"(9) the degree of performance of work on the employer's premises;

"(10) the degree to which the employer sets the order and sequence of work;

"(11) the necessity of oral or written reports;

"(12) whether payment is by the hour, day or job;

"(13) the extent to which the employer pays business or travel expenses of the worker;

"(14) *the degree to which the employer furnishes tools, equipment, and material;*

"(15) the incurrence of significant investment by the worker;

"(16) *the ability of the worker to incur a profit or loss;*

"(17) whether the worker can work for more than one firm at a time;

"(18) whether the services of the worker are made available to the general public;

"(19) *whether the employer has the right to discharge the worker;* and

"(20) whether the employer has the right to terminate the worker." (Emphasis added.) *Crawford v. Kansas Dept. of Human Resources,* 17 Kan. App. 2d 707, 710, 845 P.2d 703 (1989), *rev. denied* 246 Kan. 766 (1990).

See *Hartford,* 272 Kan. at 271.

Our court has considered the factors set out in the Restatement (Second) of Agency § 220(2) (1957):

" '(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

" '(b) whether or not the one employed is engaged in a distinct occupation or business;

" '(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

" '(d) the skill required in the particular occupation;

" '(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

" '(f) the length of time for which the person is employed;

" '(g) the method of payment, whether by the time or by the job;

" '(h) whether or not the work is a part of the regular business of the employer;

" '(i) whether or not the parties believe they are creating the relation of master and servant; and

" '(j) whether the principal is or is not in business.' " (Emphasis added.) *Knorp v. Albert*, 29 Kan. App. 2d 509, 514, 28 P.3d 1024, *rev. denied* 272 Kan. 1418 (2001) (quoting Restatement [Second] of Agency § 220[2]).

In holding that Olds-Carter was an employee of Lakeshore, rather than an independent contractor, the Board found that although the record contained evidence suggesting both employee and independent contractor relationships, the evidence was more heavily weighted in finding that Olds-Carter was an employee. The Board primarily relied upon the following evidence: (1) Lakeshore provided the truck that Olds-Carter drove, and paid for all its related expenses; (2) although the right of control was not frequently exercised, Lakeshore could control the loads hauled by Olds-Carter; (3) Lakeshore had the right to discharge Olds-Carter if she did not generate at least $2,400 per month; and (4) the work Olds-Carter performed was an integral part of Lakeshore's commercial trucking operations. Other factors relied on by the Board were as follows: Lakeshore and Olds-Carter had an ongoing relationship similar to that of employer and employee; the absence of a contract to perform a certain piece of work at a fixed price; Olds-Carter did not hold herself out as a separate business entity or trucking company or conduct business separate and apart from driving Lakeshore's truck; and Olds-Carter was not obliged to provide repairs to the truck she drove or provide any tools, materials, or supplies.

Our Supreme Court has applied the "right of control test" as the primary factor in determining the employment status of a claimant in several trucking cases. See, *e.g., Anderson v. Kinsley Sand & Gravel, Inc.*, 221 Kan. 191, 198-99, 558 P.2d 146 (1976), *superseded on other grounds Hughes v. Inland Container Corp.*, 247 Kan. 407, 799 P.2d 1011 (1990); *Knoble v. National Carriers, Inc.*, 212 Kan. 331, 333-37, 510 P.2d 1274 (1973); *Watson v. Dickey*

*Clay Mfg. Co.*, 202 Kan. 366, 376-77, 450 P.2d 10 (1969); *Wilbeck v. Grain Belt Transportation Co.*, 181 Kan. 512, 512-15, 313 P.2d 725 (1957); *Shay v. Hill*, 133 Kan. 157, 159-64, 299 P. 263 (1931). Because we are required to consider whether the Board's factual determinations are supported by substantial competent evidence in light of the record as a whole, it is necessary to review both the evidence supporting and the evidence rebutting the Board's conclusion. See K.S.A. 2009 Supp. 77-621(c)(7); *Herrera-Gallegos*, 42 Kan. App. 2d at 362-63.

*Facts Supporting the Board's Decision*

Olds-Carter maintained that before entering into the oral lease agreement with Lakeshore, there was no discussion about workers compensation and she was never told that she would be considered an independent contractor. Lakeshore owned the truck leased by Olds-Carter. Lakeshore paid for the truck's insurance, licensing, permits, fuel, repairs, and maintenance. Olds-Carter was not required to provide any tools, materials, or supplies. As her lease payment, Olds-Carter paid Lakeshore 75 percent of the compensation she earned from hauling loads for Russell and various brokers. When Russell did not have a haul for her, Olds-Carter was expected to contact brokers to arrange a haul, but Olds-Carter and other drivers indicated that Russell's hauling requests took precedence over a broker's haul. Russell occasionally directed the drivers to take a specific haul or drive to a certain location. Russell admitted that he sometimes attempted to assist the drivers in obtaining loads. Olds-Carter submitted a weekly record of her hauls to Lakeshore. Her earnings from brokers were sent directly to Lakeshore's offices; her lease payment was taken out of this amount; and Lakeshore prepared a check with the remaining amount for her to pick up. Lakeshore's drivers were expected to earn a certain income per week or they would be discharged from their lease.

Consequently, the right was reserved by Lakeshore to discharge any hauler who failed to earn sufficient moneys to cover his or her lease. It is the right to interfere that establishes the difference between a mere servant and an independent contractor. *Falls*, 249 Kan. at 64. In addition, Lakeshore's drivers were each listed as an

"employee" on a form filled out by Lakeshore. Olds-Carter's truck listed "Lakeshore Farms, Inc., Forest City, Missouri" on the door panel. Olds-Carter did not conduct business separate and apart from driving Lakeshore's truck.

*Facts Rebutting the Board's Conclusion*

According to Russell, the terms of his oral lease agreement with Olds-Carter contemplated that she would be considered an independent contractor and that workers compensation coverage would not be provided. Lakeshore did not control the day-to-day operations of the drivers, including what brokers they hauled for, how many loads they hauled, how many days or hours they worked per week, or what route they took. One of Lakeshore's drivers referred to himself as an independent contractor. Some drivers disputed the testimony that Russell's hauls took precedence over broker hauls and maintained that they had actually turned down Russell's hauling requests on occasion.

*Substantial Evidence Supports the Board's Finding that Olds-Carter Was an Employee of Lakeshore*

Despite Lakeshore's attempts to separate its business (leasing farm equipment) from Olds-Carter's business (hauling grain and other items for "various companies and individuals") by referring to them as independent contractors and alleging that it asserted no control over its drivers, the record supports a finding that Olds-Carter was an employee of Lakeshore. "The relationship of contracting parties depends on *all* the operative facts; the label which they choose to employ is only one of those facts." *Hartford,* 272 Kan. at 275.

Additionally, as stated earlier, "[i]t is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor." *Falls,* 249 Kan. at 64. Here, Lakeshore retained the right or authority to interfere or control. As a result, under the right to control test, Lakeshore retained sufficient control over Olds-Carter's conduct to support the Board's finding that she was an employee.

In addition, the other factors, which we have previously highlighted, that Kansas courts have used for determining whether a worker is an independent contractor or an employee show that Olds-Carter was an employee and not an independent contractor when she was injured. For example, Olds-Carter did not have a distinct business because Lakeshore owned and supplied the truck that she used for her hauling business. If Lakeshore decided not to supply Olds-Carter with a truck, her business would end. Consequently, Olds-Carter did not have a business distinct from her relationship with Lakeshore, who furnished the truck for her hauling business. See *Howard Sheppard, Inc. v. McGowan*, 137 Ga. App. 408, 224 S.E.2d 65 (1976) (Driver who did not supply his own truck was treated as an employee.); *Workmen's Compensation Appeal Bd. v. Navajo Freight Lines, Inc.*, 19 Pa. Commw. 25, 338 A.2d 766 (Hauler who did not supply his own truck was an employee.).

Given the substantial evidence in the record as a whole supporting the Board's finding, and our inability to reweigh the evidence or engage in de novo review, the evidence that Lakeshore and the Fund contend rebuts the Board's finding is insufficient to support reversal of the Board's finding. See K.S.A. 2009 Supp. 77-621(c)(7), (d); *Redd*, 291 Kan. at 182-83.

*Is the Board's Finding that the Fund Is Obligated to Pay the Award, Due to Lakeshore's Insolvency, Supported by Substantial Competent Evidence?*

Finally, the Fund challenges the Board's determination that Lakeshore was insolvent. K.S.A. 44-532a(a) obligates the Fund to pay the award if Lakeshore has no insurance to cover the award and is financially unable to pay the award. The Fund admits that Lakeshore did not have workers compensation insurance on the date of Olds-Carter's accident. Thus, the issue turns on Lakeshore's ability to pay.

In considering the Fund's liability, the Board stated:

"[T]here is sufficient evidence in this record to establish a prima facie case that respondent is financially unable to pay claimant's workers compensation benefits. Mr. Russell's testimony is uncontradicted that all but one of respondent's semi-

trucks is encumbered. Likewise, the evidence establishes that respondent's combine is encumbered and the trailers that respondent possesses are leased. There is no evidence of respondent's equity. Mr. Russell's testimony is also uncontradicted that the payments he makes to respondent [are] primarily used to pay the notes on respondent's equipment."

The Fund contends that Lakeshore is not insolvent, maintaining that Lakeshore previously paid medical expenses and temporary total disability payments to Olds-Carter exceeding $10,000, and Lakeshore has assets of considerable value. Olds-Carter does not bear the burden of proving Lakeshore's inability to pay the award. See *Helms v. Pendergast,* 21 Kan. App. 2d 303, 313, 899 P.2d 501 (1995). The question is whether this evidence is sufficient to support reversal of the Board's decision.

The Fund's argument is not supported by the record. The Fund furnishes no citation to the record to support its assertion that Lakeshore previously paid Olds-Carter's medical expenses. Moreover, although the Fund refers to Lakeshore's tax returns which list "numerous assets of considerable financial value," no such tax returns are included in the record. "An appellant has the burden to designate a record sufficient to establish the claimed error; without such a record, the claim of error fails. [Citation omitted.]" *Kelly v. VinZant,* 287 Kan. 509, 526, 197 P.3d 803 (2008).

Nevertheless, during oral argument, the Fund maintained that K.S.A. 44-532a(a) places the burden on Olds-Carter to pierce the corporate veil of Lakeshore to impose the liability for Lakeshore's corporate activity (an uninsured employer) on Russell or some other entity that Russell controlled. Although, under K.S.A. 44-512a(b), an employee can sue his or her employer to collect an administrative award of disability and medical compensation civil penalties and attorney fees, the employee will not sue his or her insolvent employer when there is a solvent State fund from which the award may be obtained. See K.S.A. 44-532a. K.S.A. 44-532a states in relevant part:

"(a) If an employer has no insurance to secure the payment of compensation, as provided in subsection (b)(1) of K.S.A. 44-532 and amendments thereto, and such employer is financially unable to pay compensation to an injured worker as required by the workers compensation act, or such employer cannot be located

and required to pay such compensation, the injured worker may apply to the director for an award of the compensation benefits, including medical compensation, to which such injured worker is entitled, to be paid from the workers compensation fund."

K.S.A. 44-532a(a) clearly states that if an employer is insolvent and uninsured, the State pays the employee's compensation benefits to the employee out of the Fund. Moreover, the Insurance Commissioner can then sue the employer under K.S.A. 44-532a(b). It follows that by satisfying the claim of the employee, the Insurance Commissioner "steps into the shoes" of the employee and is subrogated to the rights of the employee. This is a proper interpretation of K.S.A. 44-532a(a) because the policy and purpose behind the Act is to furnish a remedy which is both expeditious and free from proof of fault. Society benefits from such a policy because it is relieved "of the burden of supporting those injured or the dependents of those killed in industry." *Green v. Burch*, 164 Kan. 348, 356, 189 P.2d 892 (1948). If we adopted the Fund's interpretation of K.S.A. 44-532a(a), it would frustrate the policy and the purpose of the Act. As a result, the burden is properly placed on the Fund to pursue a subrogation action against an insolvent and uninsured employer under K.S.A. 44-532a(b).

Finally, the Board's findings are supported by the record. Olds-Carter testified, and the record reflects, that she has medical bills that remained unpaid as of the date of the hearing before the ALJ. Russell testified that he has loans on all of his trucks except for one and that his trailers and combines are also encumbered. Lakeshore owns no stocks, bonds, or real property. Finally, Russell testified that he did not draw a salary or a dividend from Lakeshore and that all funds generated by Lakeshore are used to pay off notes on its equipment. There is substantial competent evidence to support the Board's finding that owing to Lakeshore's insolvency, the Fund is obligated to pay Olds-Carter's award.

Affirmed.